EL PUEBLO DE PUERTO RICO, demandante y apelado, v. LUIS MANUEL MATOS PRETTO, acusado y apelante.

*Números:* CR-64-420  *Resueltos:* 2 de febrero de 1966
CR-64-421

*Santos P. Amadeo* y *Rafael S. Vidal,* abogados del apelante; *J. B. Fernández Badillo, Procurador General,* y *Rodolfo Cruz Contreras, Sub-Procurador General,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

En estos recursos el punto principal debatido es: Si el dar muerte ilegal a dos o más personas al ocurrir un accidente de automóvil, constituye nada más que un solo delito de homicidio involuntario o tantos delitos de homicidio involuntario, separados y distintos, como personas resultaron muertas en ocasión del mismo accidente.

Como a la una de la tarde del día 17 de junio de 1962, caminaban a pie, por la orilla izquierda de la carretera pública Núm. 3, tramo de Yabucoa a Humacao, en dirección hacia esta ciudad, la anciana Balbina Fuentes Rodríguez y su nieta

Leila Margarita Rodríguez López. Por esa carretera transitaba Luis Manuel Matos Pretto conduciendo un automóvil, también en dirección hacia Humacao, acompañado por Santiago Amaro Cintrón. Poco antes de dar alcance a dicha anciana y a su nieta se desvió hacia la izquierda dicho automóvil y las arrolló, ocasionando a ambas tan graves lesiones que fallecieron en seguida.

El 11 de julio de 1962 el fiscal formuló contra el conductor Luis Manuel Matos Pretto dos acusaciones de homicidio involuntario, una con motivo de la muerte de la anciana Balbina Fuentes Rodríguez, y la otra con motivo de la muerte de la nieta Leila Margarita Rodríguez López. Tienen el mismo texto con excepción del nombre de la víctima. La relativa a la anciana dice en lo pertinente:

"El fiscal formula acusación contra Luis Manuel Matos Pretto . . . por delito de homicidio involuntario . . . cometido de la manera siguiente: El referido acusado . . . de manera ilegal y mientras conducía un vehículo de motor, lo hizo sin observar la debida prudencia y circunspección, guiando a una velocidad mayor de la que le permitía ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando fue necesario para evitar atropellar a otras personas o niños, sin dar alarma ni aviso a peatones que transitaban por la orilla de la carretera, sin tomar en cuenta el tráfico en dicha carretera, manejando dicho vehículo en forma negligente y sin tomar medidas para evitarlo, por todo lo que arrolló al ser humano Balbina Fuentes Rodríguez, ocasionándole así la muerte ilegal."

Durante los días 16 y 17 de setiembre de 1963 se celebró la vista de ambos casos ante un jurado. El fiscal ofreció en juicio las declaraciones de ocho testigos; declaró en su defensa el acusado y ofreció además las declaraciones de dos testigos uno de los cuales era el que lo acompañaba en el día del accidente. El jurado rindió en cada caso un veredicto de culpable del delito de homicidio involuntario. Se le impuso la pena de un año de cárcel en cada caso, para cumplirse con-

secutivamente, decretándose la cancelación de la licencia de conductor por un año.

En apelación contra las sentencias(1) sostiene: (1) el juicio y las sentencias son nulos "ya que . . . no tuvo un juicio imparcial en vista de que hubo un 'variance' entre lo alegado en la acusación y la prueba desfilada en el proceso"; (2) el tribunal sentenciador erró al sostener que el fiscal podía impugnar la declaración del acusado con una declaración que éste dio al fiscal sin haberle advertido de su derecho constitucional a no declarar y del derecho a tener asistencia de abogado; (3) también erró al sostener que el fiscal podía impugnar la declaración de un testigo de defensa con una declaración que dicho testigo había prestado durante la investigación preliminar; (4) el proceso y la sentencia son nulos e ineficaces porque el taquígrafo no tomó el informe del fiscal según se lo había ordenado el tribunal; (5) el veredicto no está sostenido por la prueba y (6) el tribunal erró al sentenciar al acusado por la muerte de las dos víctimas a pesar de que ocurrieron como resultado de un acto de negligencia.

1. A juicio nuestro no existió divergencia, incongruencia o desacuerdo entre lo alegado en la acusación y la prueba desfilada en el proceso. Según las acusaciones la muerte ilegal de la anciana y de su nieta se ocasionó al realizar el acusado el acto de conducir su automóvil en las siguientes formas ilegales: (1) sin la debida prudencia y circunspección; (2) a una velocidad mayor de la que le permitía ejercer el debido dominio del vehículo y reducir la velocidad o parar cuando fuera necesario para evitar atropellar a otras personas; (3) sin dar alarma ni aviso a peatones que transitaban por la orilla de la carretera; (4) sin tomar en cuenta el tráfico en dicha carretera; (5) manejando dicho vehículo

---

(1)El acusado solicitó la celebración de un nuevo juicio fundado en el descubrimiento de nueva prueba. Fue denegada la petición y de la resolución al efecto apeló. Nada plantea ante nos respecto a este incidente.

en forma negligente y (6) sin tomar medidas para evitar arrollarlas. (²)

■■■ El homicidio involuntario conforme al Art. 203 de nuestro Código Penal, se comete al darse muerte ilegal a un ser humano sin que medie malicia cuando ocurre al realizarse un acto ilegal, que no constituyere delito grave; o al realizarse un acto legal que pudiera ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección Ese artículo no exige la concurrencia de todas esas formas ilegales de actuar o conducir para que se produzca la muerte ilegal; basta que ocurra cuando se realice un solo acto ilegal de la naturaleza a que se refiere ese artículo. Cf. *Pueblo* v. *Serrano Pagán*, 85 D.P.R. 684, 696 (1962).

El Pueblo probó casi todas las seis formas de conducción ilegal que el fiscal le atribuyó al acusado en ambas acusaciones.

La prueba de cargo estableció positivamente: que en los momentos en que la anciana y su nieta caminaban a pie, por la orilla izquierda de la carretera Núm. 3, en dirección hacia Humacao "venía ese señor [el acusado] en un carro . . . de Yabucoa a Humacao; entonces desvió hacia la izquierda y cogió la viejita, la destrozó en pedazos . . . ." el carro tiró a la niña, le dio a un poste de la luz y se viró allí mismo (T.E. págs. 12–13); la carretera era ancha y en ese momento por allí no transitaban otros automóviles (T.E. pág. 18) se desvió del carril derecho hacia el carril izquierdo atravesando la carretera, dándole a Balbina Fuentes, matándola y . . . pasándole por encima y alcanzando a la joven también le dio y la mató y pasándole por encima se paró más

---

(²) La Ley de Vehículos y Tránsito de Puerto Rico, Núm. 141 de 1960, declara ilegales y penaliza como delitos menos grave todas esas formas, modos o maneras de conducir un vehículo de motor. Sus Secs. 5-201 y 5-1002(3) prohiben las formas numeradas 1, 5 y 6; su Sec. 5-101(a) las numeradas 2 y 4 y la Sec. 5-1002(3) prohibe la numerada 3 y como antes se indica, también la número 6.

abajo . . ." (T.E. pág. 37) "no les dio tiempo a defenderse ni nada . . . él se desvió y las alcanzó a poca distancia, (T.E. pág. 39) a ambas les dio por la espalda" (T.E. pág. 40); "no les dio a ambas al mismo tiempo", "le dio a la señora y la tumbó. Entonces alcanzó a [la] otra poquita de distancia, la muchacha y le dio." (T.E. pág. 41); "no venían cogidas de mano . . . la anciana venía atrasito y la muchacha venía delante" (T.E. pág. 42); "ese carro no tocó ni enfrenó ni nada"; "el carro estaba bien no tenía goma defectuosa alguna", (T.E. pág. 44) se hizo una "inspección de los frenos y del tren delantero del automóvil y no encontramos desperfecto alguno." (T.E. pág. 110.)

Lo que antecede es parte de los testimonios no contradichos, de tres vecinos del lugar del accidente y que presenciaron el mismo.

Por otro lado, por evidencia creída también por el jurado quedó comprobado que poco después de ocurrir el accidente se acercó al sitio un automóvil conducido por Mario Piñero, en el que viajaban también su esposa Fany Piñero y una persona nombrada Luisa Ferrer. Entonces el acusado y su acompañante Santiago Amaro Cintrón suplicaron a los esposos Piñero que, por temer ambos por su seguridad, los llevaran al cuartel de la policía de Humacao. Accedieron esos esposos a ello y mientras se dirigían hacia Humacao iba llorando el acusado y libremente les dijo "que venía de Maunabo, de visitar la tumba del abuelito que había muerto recientemente; que ellos son de Bayamón, había trabajado hasta tarde en la noche, entonces regresaba para trabajar y se había quedado dormido y había ocasionado dos muertes." (T.E. págs. 32 y 46.)

Si lo que directamente vieron los tres primeros testigos fue realizado por el acusado con plena conciencia de lo que hacía en esos momentos o si ocasionó esas muertes al quedarse dormido, en uno u otro caso, realizó conscientemente un acto

ilegal que ocasionó esas dos muertes ilegales o lo realizó sin la debida prudencia o circunspección. ([3])

■ Obviamente no existió fundamental divergencia entre lo alegado en las acusaciones y la prueba presentada. La posible insuficiencia de la evidencia ofrecida respecto a alguna de las formas ilegales de conducir, no creó una situación de incongruencia. Mucho menos quedó establecido por la prueba un delito diferente del imputado.

Para la fecha del juicio estaban en vigor las actuales Reglas de Procedimiento Criminal. La Núm. 38(d) dispone lo siguiente:

"(d) *Incongruencia entre las alegaciones y la prueba.* El tribunal podrá permitir enmiendas a la acusación, a la denuncia o a un escrito de especificaciones en cualquier momento antes de la convicción o absolución del acusado, en caso de que hubiere incongruencia entre estas alegaciones y la prueba. La incongruencia o desacuerdo entre las alegaciones y la prueba no será fundamento para la absolución del acusado; pero el tribunal; siempre

---

([3]) Dijimos en *Rodríguez Rolón* v. *Tribunal Superior*, 91 D.P.R. 840 (1965):

"Aunque controvertiblemente, se presume que toda persona intenta la consecuencia ordinaria de un acto cometido por ella voluntariamente. No puede argüirse que la conducta observada por el peticionario hasta el preciso momento en que se duerme, no fue voluntaria. Desde que él, por su cuenta comenzó a conducir, no obstante su estado de agotamiento, cansancio, fatiga mental y prolongada falta de sueño, se convirtió en una amenaza o peligro potencial para la seguridad y vida de las demás personas circulantes por esas vías públicas. El conductor que por su conducta crea un peligro para los que por ellas transitan, no puede negar que tuvo la intención de producir daños a cualquier persona y sus propiedades, aunque no la tuviera para una determinada.

.     .     .     .     .     .     .     .

"No es por lo que él hizo o pudo haber hecho mientras se encontraba dormido que se le denunció y condenó, sino por su precedente conducta imprudente al decidir guiar en ese estado, por su descuido y falta de tomar las medidas que su estado aconsejaban tomarse y al no evitar que ocurriera lo que él había previsto que podría ocurrir. Como acertadamente expresó el Tribunal Superior: 'Si el apelante estaba consciente de su cansancio físico y de su fatiga mental no ha debido asumir la responsabilidad de conducir un vehículo de motor. Al hacerlo fue crasamente negligente y debe responder de la consecuencia natural de su acto imprudente.'"

que el acusado no se opusiere, deberá posponer el juicio si es de opinión que los derechos sustanciales del acusado se han perjudicado, para celebrarlo ante otro jurado o ante el mismo tribunal si el juicio no fuere por jurado, y según el tribunal determinare.

"Si la incongruencia o desacuerdo es de tal naturaleza que la prueba estableciere un delito distinto del imputado, no incluido en éste, o estableciere la comisión de un delito fuera de la competencia del tribunal, se deberá disolver el jurado y se sobreeserá el proceso."

En el juicio el acusado no suscitó realmente cuestión alguna de incongruencia. Al terminarse de presentar la prueba de cargo se limitó a solicitar su absolución porque esa prueba "no constituía prueba de negligencia." En su contra se resolvió ese planteamiento.

■ 2 y 3. En su segundo y tercer señalamientos alega el apelante que erró el tribunal sentenciador al sostener que el fiscal podía impugnar las declaraciones en juicio del acusado y de su testigo Amaro Cintrón con declaraciones que ellos prestaron ante el fiscal durante la investigación preliminar. Ninguno de estos dos señalamientos tiene mérito alguno.

Las declaraciones del acusado y su mencionado testigo dadas en juicio, tendieron a probar que delante del automóvil del acusado caminaba otro a poca velocidad; que el acusado trató de pasarle en los momentos en que la anciana y su nieta entraban a la carretera; que al tratar, con ese fin, el acusado de girar hacia la izquierda, el guía de su carro "comenzó a dar vueltas para ambos lados y no pudo controlarlo" yéndose sobre ellas y arrollándolas.

A preguntas del fiscal ambos admitieron que en el día del suceso habían prestado declaraciones ante el fiscal y que en ellas no habían expuesto que el guía del carro del acusado en aquel momento comenzara a dar vueltas y que por eso perdiera el acusado el control y dominio de sus movimientos. Negó el acusado haberle entonces declarado al fiscal "que había perdido el control del guía con motivo del grito que se

había sacado la señora, la anciana en ese momento." El fiscal no ofreció alguna de esas anteriores declaraciones como prueba de refutación, ni con ningún otro fin. Los casos de *Escobedo* v. *Illinois*, 387 U.S. 181, *White* v. *Maryland*, 373 U.S. 59 y *People* v. *Anderson*, 40 West's Cal. Rptr. 257, a la luz de las circunstancias concurrentes en los recursos de autos, no tienen aplicación. (³ᵃ)

■ 4. Por el cuarto señalamiento de error sostiene el apelante que "el proceso y las sentencias dictadas contra el acusado son nulas e ineficaces porque el taquígrafo no tomó el informe del fiscal al jurado según lo ordenó el juez sentenciador." Arguye el apelante "que se le ha privado de un derecho a que se apelara a base de todo lo que ocurrió durante el proceso y por lo tanto se le ha privado de su libertad sin el debido proceso de ley", que el acusado tiene derecho "a que la apelación se haga a base del récord taquigráfico del proceso incluyendo el informe del fiscal, porque el mismo forma parte del proceso y si se solicita que se tome dicho informe la presunción es que el mismo es necesario para la apelación." Cita los casos de *Pueblo* v. *Vélez*, 77 D.P.R. 817, *Pueblo* v. *Fournier*, 80 D.P.R. 390 y *Reyes Oyola* v. *Delgado*, 81 D.P.R. 937.

Tan pronto como se examinan los autos originales de ambos casos y la transcripción de evidencia, se concluye que el señalamiento de error es, además de frívolo, curioso, raro y sorprendente.

Es cierto que el terminarse la presentación de la evidencia de ambas partes y al llegar el turno de los informes al jurado uno de los letrados del acusado solicitó del tribunal que ordenara al taquígrafo que tomara textualmente el informe del fiscal y que el tribunal así lo ordenó. (T.E. pág. 115.)

Empero, es también cierto que en el mismo día en que el acusado instó sus recursos de apelación sus letrados suscri-

---

(³ᵃ) Cf. *Walder* v. *U.S.*, 347 U.S. 62 (1954) ; *United States* v. *Currie*, 354 F.2d 163 (2d Cir. 1965).

bieron y presentaron en el tribunal de instancia la siguiente moción:

"Moción Solicitando Transcripción de Evidencia Al Hon. Tribunal:

"Comparece el acusado por conducto de los abogados que suscriben y respetuosamente alegan, exponen y solicitan:

"1. Que el acusado ha apelado para ante el Tribunal Supremo de las sentencias dictadas por este Tribunal en los casos del epígrafe.

"2. Que para poder perfeccionar la apelación el acusado necesita que este tribunal ordene al taquígrafo que transcriba el récord del proceso, *con la excepción del informe del fiscal y el informe que hicieron los abogados de la defensa.* [La subraya está en el original, puesta por los propios abogados.]

"Por todo lo Cual, el acusado respetuosamente solicita de este Tribunal que dicte una orden para que el taquígrafo haga la transcripción según lo requieren la ley y la jurisprudencia."

Y es cierto también que con fecha 18 de febrero de 1964, el tribunal de instancia, accediendo a la anterior moción, ordenó la preparación de la transcripción taquigráfica, pero,

" . . . con excepción del informe del fiscal y el informe del abogado de la defensa. . . ."

Dicho lo anterior, es innecesario mayor ilustración en abono de la improcedencia, frivolidad y de la naturaleza de mera curiosidad del señalamiento de marras.

5. La sola enunciación de las únicas cuatro líneas que dedica el alegato del apelante al quinto señalamiento, basta para no considerarlo. Todo lo que en ellas dice es: "El acusado apelante sostiene que a pesar de que el jurado declaró culpable al acusado, la prueba desfilada en el proceso es de tal naturaleza conflictiva, que no es suficiente para sostener la validez de los veredictos." (4)

---

(4) Un señalamiento de error, que no sea fundamental, que se expone pero no se discute en el alegato, ni se demuestra en qué se basa, no será considerado en apelación. Véanse: *De Jesús* v. *Assad*, 63 D.P.R. 137, 140 (1944); *Pueblo* v. *Alsina*, 79 D.P.R. 46 (1956); *Pueblo* v. *Torres Rosario*, 89 D.P.R. 144 (1963).

124

■ 6. Cuestión de derecho que plantea el último señalamiento de error: Si al ocurrir la muerte ilegal de dos o más personas en ocasión de un accidente de automóvil debido a la negligencia de su conductor, procede formularse contra éste una sola acusación de homicidio involuntario por todas las muertes causadas, o si, por el contrario, procede formularse una acusación, distinta y separada, por cada persona muerta.

Para sostener que únicamente procedía acusarlo por la muerte de una de ellas el apelante expone: (1) Que "la jurisprudencia ha sostenido casi uniformemente, que cuando ésta es la situación, distinto a cuando la muerte es intencional, sólo puede procesarse a una persona por una sola muerte"; (2) que procesarse a una persona por haber causado dos muertes influye en el ánimo del jurado y (3) ello es perjudicial porque el juez le puede imponer penas para ser cumplidas consecutivamente, como así lo hizo en estos casos.

El primer argumento—que no se apoya en autoridad alguna—es incorrecto. Presumimos que sólo se ha querido hacer referencia a la jurisprudencia continental, ya que en la nuestra no se encuentra decisión alguna relacionada con accidentes de tránsito que específicamente resuelva ese punto.([5]) No existe unanimidad de criterios en las decisiones estatales americanas que han tratado el problema. Sin embargo, la inclinación de la vertiente jurisprudencial hacia la tesis de la comisión de tantos delitos como víctimas resulten del mismo accidente, es mucho mayor que la opuesta.([6])

---

([5]) En *Pueblo* v. *Bastián,* 71 D.P.R. 843 (1950), el apelante fue acusado y convicto de dos infracciones al Art. 328 del Código Penal. Se le imputó que en ocasión en que manejaba como maquinista una locomotora actuó descuidada y negligentemente, con imprudencia e impericia, dando lugar a que la locomotora chocara contra un camión, resultando muertas dos personas que viajaban en ese camión. No se planteó en el recurso la cuestión que ahora consideramos. Las sentencias apeladas fueron confirmadas.

([6]) Las jurisdicciones norteamericanas ·que han considerado el problema de cuantos delitos comete una persona cuando mediante la operación o manejo de un automóvil en forma negligente causa la muerte a varias personas, hasta donde el tiempo de que hemos dispuesto nos ha permitido

Generalmente, la práctica en Puerto Rico ha sido la de acusar, en todo delito, tantas veces como personas hayan resultado víctimas de un solo acto u omisión punible. (⁷)

En *Pueblo* v. *Peña*, 73 D.P.R. 261 (1952) el acusado apelante fue convicto por un jurado en cinco causas por el delito de ataque para cometer asesinato. Se le imputó haber hecho tres disparos de pistola a cinco policías que ocupaban un automóvil, sin herir en forma alguna a ninguno de ellos. Resolvimos que ". . . bajo las circunstancias, únicamente podía procesarse al acusado por un solo delito de ataque para cometer asesinato." En parte, nos expresamos así:

"Interpretamos que el segundo error señalado tiene el alcance y efecto de sostener que únicamente ha debido acusársele por un solo delito de esa clase y no por cinco.

---

investigar, presenta el siguiente cuadro: A favor de tantos delitos como víctimas hayan: Arkansas, *Holder* v. *Fraser*, 215 Ark. 67 (1949), 219 S.W.2d 625; California, *People* v. *Crow*, 48 C.A.2d 666 (1941), 120 P.2d 686; Florida, *State* v. *Lowe*, DCA (1961) 130 So.2d 288; Georgia, *Wellons* v. *State*, 77 Ga. 652 (1948), 48 S.E.2d 922; Illinois, *People* v. *Allen*, 368 Ill., 368 (1937), 14 N.E.2d 397; Kansas, *State* v. *Carte*, 157 Kans. 673 (1943), 143 P.2d 774; Kentucky, *Fleming* v. *Com.*, 284 Ky. 209 (1940), 144 S.W.2d 220; Massachusetts, *Com.* v. *Maguire*, 313 Mass. 669 (1943), 48 N.E.2d 665; Minnesota, *State* v. *Fredlund*, 200 Minn. 44 (1937), 273 N.W. 353; Missouri, *Burton* v. *State*, 226 Mo. 31 (1955), 79 So.2d 242; Nebraska, *Jeppeseu* v. *State*, 154 Neb. 765 (1951), 49 N.W.2d 611; Oklahoma, *Fay* v. *State*, Cr. C.A. (1937), 71 P.2d 768; Ohio, *State* v. *Martin*, 154 Ohio St. 539 (1951), 96 N.E.2d 776; Virginia, *Lawrence* v. *Com.*, 181 Va. 582 (1943), 26 S.E.2d 54; Washington, *State* v. *Taylor*, 185 W. 198 (1936), 52 P.2d 1252.

Véase también: Blashfield, *Cyclopedia of Automobile Law and Practice*, Vol. 8, sec. 5494, págs. 529–530, Wharton's *Criminal Law and Procedure*, Vol. I, págs. 335 y 377, 14 Cal. Jur.2d sec. 93, pág. 228, Anno: *Acquittal or Conviction of One Offense in Connection with Operation of Automobile as Bar To Prosecution for Another*, 172 A.L.R. 1053, y otras anotaciones relacionadas en 20 A.L.R. 341, Supl. en 113 A.L.R. 222.

A favor de un solo delito: Iowa, *State* v. *Weelock*, 216 Ia. 1428 (1933), 250 N.W. 617; New Jersey, *State* v. *Cosgrove*, 103 N.J.L. 412 (1927), 135 Atl. 871; Pennsylvania, *Com.* v. *McCord*, 116 Pa. Super. 480 (1935), 176 Atl. 834; Tennessee, *Smith* v. *State*, 159 Tenn. 674 (1929), 21 S.W.2d 400.

(⁷) Véanse: *Pueblo* v. *Albizu*, 77 D.P.R. 896 (1955) y *Pueblo* v. *Palóu*, 80 D.P.R. 364 (1958).

"La cuestión así planteada ha dado lugar, en casos de esta naturaleza, a un conflicto irreconciliable en la jurisprudencia del continente, pues si bien algunos estados de la Unión sostienen que cuando hay un solo ataque (*assault*), acto o transacción contra varias personas el acusado puede ser procesado tantas veces como personas han sido objeto del ataque, acto o transacción, sin embargo, hay otros que han resuelto que únicamente puede procesarse al transgresor por un solo delito.

"El estudio minucioso y detenido que del problema hemos hecho nos convence de que en casos de esta índole la cuestión a ser determinada es si el acto, ataque o transacción del acusado lesionó o no físicamente a otras personas y si para demostrarlo la prueba requerida en cada caso es la misma, o distinta. Si el ataque hecho por el acusado no produjo lesión física a las varias personas objeto del mismo y si la prueba requerida en cada caso es idéntica, sólo puede procesarse al acusado por un delito. Por el contrario, si como resultado del mismo ataque, del mismo acto o de la misma transacción varias personas han sido lesionadas, heridas o muertas, entonces pueden presentarse contra el transgresor tantas acusaciones como personas afectadas haya, siempre que la evidencia requerida en cada caso sea distinta—no importa que la diferencia en la prueba sea tan sólo una *scintilla*, digamos, por ejemplo, en relación con el *corpus delicti*—. 45 Harv. L. Rev. 535; 37 id. 912; 20 id. 642; 40 Yale Law Journal 462; 18 Calif. L. Rev. 171, 179; 14 Calif. L. Rev. 133; Dangel, *Criminal Law,* pág. 373, sección 199; Wharton's *Criminal Law,* Vol. 1, 12a. Ed., págs. 531, 537, sección 394; *Piquett* v. *United States,* 81 F.2d 75; *Commonwealth* v. *Roby,* 29 Mass. 496; *People* v. *Lagomarsino,* 217 P.2d 124; *State* v. *Corbett,* 109 S.E. 133; *People* v. *Majors,* 65 Cal. 138; *Spannell* v. *State,* 203 S.W. 357; 113 A.L.R. 215 y anotación a la pág. 222; 20 A.L.R. 341."

No vemos razón válida para dejar de aplicar el anterior criterio en la resolución de casos en que han resultado lesionadas, heridas o muertas varias personas en ocasión de un solo accidente de vehículo de motor, motivado por la negligencia, descuido, imprudencia, impericia, falta de circunspección, o por cualquier otra actuación o conducta no intencional, maliciosa o dolosa de su conductor.

Como hemos expuesto, en la gran mayoría de los estados continentales que han bregado con este problema, se admiten tantas acusaciones como personas heridas, lesionadas o muertas. En su obra *Cyclopedia of Automobile Law and Practice*, Vol. 8, págs. 529 y 530, Blashfield afirma:

"Se ha sostenido que cuando dos o más individuos resultan heridos en su persona, aunque sea en *un solo acto,* habrá un número de delitos correspondiente al número de personas perjudicadas, ya que las consecuencias del acto ha afectado separadamente a cada uno de los perjudicados. Bajo esta regla, por tanto, cuando dos o más personas resultan muertas o heridas en un accidente de automóvil, el resultado de un proceso que envuelva a uno de los perjudicados no impide otro proceso basado en la muerte o daño causado a los otros perjudicados." (Bastardillas nuestras.)

El Art. 203 de nuestro Código Penal define el delito de homicidio y sus dos clases del siguiente modo:

"Homicidio es dar muerte ilegal *a un ser humano* sin que medie malicia. Es de dos clases:

1. Voluntario: Cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera.

2. Involuntario: Cuando ocurre al realizarse un acto ilegal, que no constituye delito grave (felony); o al realizarse un acto legal que pudiera ocasionar muerte en forma ilegal, o sin la debida prudencia o circunspección."

Con la muerte ilegal, no maliciosa, de "un ser humano" en ocasión de realizarse un acto legal sin la debida prudencia o circunspección, queda perpetrado un delito de homicidio involuntario. Los Arts. 205 y 206 hablan en términos singulares como "para que la muerte constituya . . . homicidio será preciso que la víctima muera" y "ninguna persona podrá ser convicta de . . . homicidio a menos que la muerte de la persona," etc. No se refieren a "seres humanos," ni a "personas muertas." Se incurre pues, en delito, con perfecta independencia y sustantividad, cada vez que un ser humano muere en esas circunstancias.

Generalmente la voluntad del conductor que causa una muerte o un grave daño corporal no está dirigida hacia ese resultado. La mayoría de los delitos de tráfico acaecen contra la voluntad del conductor. Se trata de delitos de culpa, dentro del sentido estricto de ésta. El sujeto es consciente de la omisión del cuidado debido, sabe que conduce a velocidad excesiva y contra las normas elementales; quiere hacerlo; es consciente de que con ello amenaza la seguridad de la circulación, la vida de las personas y su integridad física; es una actitud psíquica de temeridad e inconsideración, como afirma el profesor Beristain, de la Universidad de Deusto, en su interesante monografía *"Delincuencia del Tráfico y Delincuencia Juvenil"*, publicada en el tomo 113, págs. 7-61, de la Revista de Legislación y Jurisprudencia, 1965. [8]

[8] Comentando el profesor Beristain sobre las causas del accidente del tráfico nos dice que si bien, en cuanto al hecho, la causa aparece generalmente limitada o concretizada en una omisión del debido cuidado, si se logra psicoanalizar la etiología honda e inconsciente de esa conducta, descubrimos casi siempre un fallo notable y reprochable en la personalidad del conductor, agrupando esas personalidades así: La personalidad criminal, el tipo más peligroso; la mayoría son jóvenes con antecedentes de delitos comunes, como ladrones de vehículos, fugitivos de instituciones penitenciarias y los perseguidos por la policía. La personalidad inadecuada, salvaje; tiene rasgos de inadaptación, sin llegar al grado de delincuente agresivo. "La personalidad asocial, por inmadurez o crisis. No han integrado todavía en su vida la dimensión social del tráfico, o sufren un trauma interno-ambiental. En terminología psicológico-psiquiátrica no se les puede diagnosticar como anormales o psicópatas. Aunque en la vida social, fuera de la carretera, muestran un comportamiento sin tacha, en la carretera cometen verdaderos delitos; en la carretera parecen enfermos; en su cosmovisión apetitivo-sensitiva carecen de la faceta social y comunitaria del tráfico; tienen conocimiento conceptual de las normas del Código de la circulación, pero no conocimiento valorativo; manejan el coche como un juguete, como una diversión individual, no como un quehacer comunitario. La fuerza del motor ha desvelado su interna debilidad personal, y ha facilitado la manifestación de su inmadurez o crisis; hombres que en lo íntimo de su psiquismo sienten insatisfacción, inseguridad, y, a veces, temor; hombres que espoleando los caballos de su acelerador buscan la compensación de su oculto complejo de debilidad o de inferioridad; aman la velocidad, aman los adelantamientos peligrosos, para evadirse, para saciar su instinto de triunfo frustrado en su vida privada o empresarial (47). Este bloque es el más amplio, y está formado principalmente por jóvenes."

La claridad del texto del Art. 203 de nuestro Código Penal no ofrece margen alguno para interpretarse en el sentido de que, tratándose de un solo acto de imprudencia o falta de circunspección, el hecho justiciable es uno solo, porque uno solo fue el acto inicial. Estamos ante un delito culposo contra la persona; la protección de ésta es lo que predomina en su letra. La prueba del *corpus delicti* en cada caso es diferente ya que el sujeto pasivo en cada infracción del artículo es distinto.

No nos toca declarar la existencia de impunidad implícita respecto a las sucesivas víctimas del mismo accidente culposo en ausencia de una disposición legal que obviamente lo permita. Si ello es necesario o conveniente para el interés

---

Continúa diciendo el profesor Beristain:

"(III) Podemos, pues, concluir algo sumamente tranquilizador y al mismo tiempo intranquilizador (48):

"(A) La mayoría de los delincuentes de carretera son hombres normales. En su vida externa llevan una conducta sin tacha; jamás han infringido, ni infringirán conscientemente un artículo del Código penal, pero,

"(B) La mayoría de los delincuentes de carretera son hombres cuya autoconciencia (exagerada) de buen caballero y buen conductor les concede patente de corso para menospreciar e infringir las normas de tráfico; la experiencia les ha confirmado que a ellos no les sucede ningún accidente, y creen que por eso pueden prescindir de lo obligatorio para la generalidad.

"La causa principal de los accidentes, no radica en la perturbación externa del coche, del peatón, o de la carretera, sino en la perturbación interna (reprobable) del psiquismo del conductor, en la no consideración del tráfico como tarea social, en la merma de los valores comunitarios del hombre medio de nuestros días. Hombre cuyo *llo* no ha sido superado por el *yo*, ni por el *superyo*, e impulsado por el deseo de notoriedad, amenaza continuamente (e inconscientemente) agresivo. Hombre para quien el otro no es un compañero (¿hermano?) sino un competidor al que hay que pasar, sea como sea, aun eliminándole. El progreso técnico fomenta esa idea. La prosperidad moderna no está acompañada de un sentido humano y cristiano del límite (49). Falta la seguridad y la satisfacción de lo personal (imanente-trascendente), y la inquietud psicológica que ello trae consigo se traduce en un deseo de acción, que por ausencia de sentido interpersonal, es acción evasiva, agresiva y delictiva."

público corresponderá hacerlo en su día al órgano legislativo estatal. (⁹)

■ Con la presentación de más de una acusación en estos casos no se infringe la prohibición de la doble exposición por el mismo delito. Aquí se trata de dos delitos separados

---

(⁹) El Código Penal de España en su Art. 565 penaliza la imprudencia temeraria y la simple imprudencia o negligencia. El Tribunal Supremo español en sentencia de 2 de abril de 1932 estimó que "si se produjeron como consecuencia de un acto imprudente tres delitos, uno de daños y dos de homicidio, como todos ellos son consecuencias de un solo acto culposo, no cabe penarlos por separado." Puig Peña en su obra *Derecho Penal*, 5ta. ed., Tomo I, Vol. Primero, Barcelona, 1959, pág. 325, cita esa sentencia sin comentario alguno. Sin embargo, Jiménez de Asúa, en su monumental *Tratado de Derecho Penal*, Tomo V, 2da. ed., Editorial Losada, Buenos Aires, 1963, págs. 1064-1065, no encuentra acertado ese criterio y prefiere el de los tribunales argentinos sobre la materia. Dice el maestro:

"Sin darse cuenta de lo que dice—y sólo en ciega prosecución de las decisiones del Tribunal Supremo—ha estampado esta frase Eugenio Cuello Calón: 'Aun cuando de un solo hecho imprudente se originen males diversos, como el hecho culposo es uno solo, existe un solo delito de imprudencia' (D. p., tomo I, pág. 400). Cuello entroniza así, sin saber lo que está haciendo, la fórmula del *crimen culpae*, que sabemos no ha acogido en todo su rigor el Código de España.

"La *jurisprudencia del Tribunal Supremo español* ha consagrado, como principio, que en caso de pluralidad de males o perjuicios sólo se imputa como uno, con lo que se cae en el peligroso camino del *crimen culpae* único y solo. Son muchas las sentencias que proclaman que en el hecho imprudente, productor de varios males, no cabe apreciar varios delitos, sino uno solo (Sentencias de 1ro. de mayo de 1871, 8 de octubre de 1887, 18 de octubre y 12 de diciembre de 1927, 14 de diciembre de 1931, 2 de abril de 1932, 11 de mayo y 14 de diciembre de 1940, etc.). Algunos de estos fallos hacen declaraciones de sumo interés: Si con el hecho imprudente se causa la muerte de una persona y además se ocasionan daños, existe un solo hecho punible, pues uno solo fue el acto, aun cuando deben apreciarse dos en orden a la responsabilidad civil (Sentencia de 14 de diciembre de 1931); existe, por tanto, error "al sancionar separadamente cada una de las dos muertes acaecidas y daños causados, toda vez que una sola fue la infracción punitiva cometida por la penada al proceder sin la debida diligencia y celo en el cumplimiento del deber que se le tenía encomendado, dando lugar con ello a los accidentes ocurridos, por los que es un único acto . . . el que hay que castigar" (Sentencia de 2 de abril de 1932); pues la técnica tradicional de nuestro Código "lleva a la conclusión de no dividir los distintos resultados de la acción culposa en otros tantos delitos cometidos por imprudencia, sino en agruparlos en una imputación única, que es la de la imprudencia que, de mediar malicia, constituiría aquellos varios delitos" (Sentencia de 11 de mayo de 1940).

y distintos generados por el mismo acto u omisión negligente. Esa prohibición se refiere al delito no a su causa. [10]

La evidencia sobre la acusación por la muerte de la anciana no era suficiente para probar los hechos imputados por la muerte de su nieta. Hubiera sido necesario probarse en el juicio por aquélla el hecho adicional de la muerte ilegal de esa nieta y la circunstancia indispensable de haber ocurrido su fallecimiento "dentro de un año y un día después de recibida la herida o de administrarse la causa de su muerte . . .". El Art. 206 del Código Penal nuestro dice:

"§ 638. Pruebas necesarias

"Ninguna persona podrá ser convicta de asesinato u homicidio, a menos que la muerte de la persona que se alegare haber sido muerta, y el hecho de la muerte que se alegare haber sido causada por el acusado, resultaren probados como actos independientes; aquélla por medio de pruebas directas y éste de modo que no haya lugar a duda razonable.—Código Penal, 1937, art. 206."

No negamos que una pluralidad de víctimas debe causar y por lo común causa, una mayor impresión en el ánimo del jurado, así como en el de cualquiera otra persona o grupo de personas normales. En toda comunidad, mientras más excepcional sea el resultado del acto u omisión culposo, más intenso será el impacto emocional que provoque. Pero esta consideración subjetiva no puede ser factor que altere

---

"En cambio, los *Tribunales argentinos*, mucho más en lo cierto, y ante la varia y excepcional tipificación de los delitos culposos, reconocen la pluralidad de éstos y someten el caso a la regla del concurso. Así tiene declarado el Superior Tribunal de Entre Ríos que si por un solo hecho imputable al procesado a título de imprudencia o impericia, resulta la muerte de una persona y lesionadas otras, tal hecho cae en las previsiones de los artículos 84 y 94 del Código Penal, y en función del artículo 54 del mismo Código corresponde aplicar la sanción que fija pena mayor (Sentencia de 23 de mayo de 1944, en *Repertorio de La Ley*, tomo VI, pág. 422, núm. 3)."

[10] La Enmienda Quinta de la constitución federal en parte dispone que no podrá nadie ". . . ser sometido *por el mismo delito* dos veces a un juicio . . ."; el apartado 11 del Art. II de la nuestra preceptúa que "Nadie será puesto en riesgo de ser castigado dos veces *por el mismo delito*"; el Art. 6 de nuestro Código Penal ordena que "ninguna persona podrá ser procesada por segunda vez *por un delito público*."

nuestro criterio. El Pueblo viene obligado a presentar la evidencia pertinente que establezca, fuera de toda duda razonable, la culpabilidad del acusado y el veredicto a rendirse debe ser a base de esa evidencia. El acusado, si cree convenir a su interés, puede ventilar su caso ante un tribunal de derecho, renunciando, en la forma de ley, a ser juzgado por un jurado. Bajo la Regla 90 de Enjuiciamiento Criminal puede pedir la celebración por separado del juicio en cada caso. Solicitó y obtuvo el apelante varias veces la suspensión del juicio, pero jamás pidió su celebración por separado. Al llamarse los casos para juicio conjuntamente el 16 de setiembre de 1963 tampoco hizo tal petición. Entonces, uno de sus letrados le dijo al tribunal: "Señor juez, aquí se van a ver los dos casos" y el tribunal asintió diciendo: "Se van a ver conjuntamente si se puede" (T.E. pág. 2) y se vieron conjuntamente luego de plantearse y resolverse adversamente el punto de que sólo procedía acusarse por un solo delito.

La determinación del modo concurrente o consecutivo de cumplir los términos de prisión descansa en la sana discreción del tribunal de instancia. A la luz de las circunstancias específicas concurrentes en cada caso y teniendo en cuenta, hasta donde fuere posible, desde luego, el derecho positivo envuelto y todos los principios o factores de justicia atendibles, se debe hacer esa determinación. En estos casos no encontramos justo motivo para alterar la determinación hecha. La estimamos adecuada a esas circunstancias.

Sin embargo, el acusado-apelante, de cumplir los requisitos o condiciones fijados por la Ley Núm. 259 de 1946, tal como fue enmendada por la número 61 de 1965, podrá pedir que se suspendan los efectos de ambas sentencias para quedar en libertad a prueba.

*Se confirmarán las dos sentencias apeladas.*