José A. Quiñones López y Doris Z. Rivera Mathews, por sí y en representación de la Sociedad Legal de Gananciales compuesta por ambos, demandantes y recurridos, *v.* Pedro Manzano Pozas, Jane Doe y la Sociedad Legal de Gananciales compuesta por ambos, Richard Doe, Jane Doe y la Sociedad Legal de Gananciales compuesta por ambos, y Nationwide Mutual Insurance Company, demandados y recurrente la última.

*Número:* RE-91-567 *Resuelto:* 25 de junio de 1996

---

[3] Sentencia de este Tribunal, pág. 129.

142

*Luis A. Lugo, Jr.*, abogado de Nationwide Mutual Insurance Company, recurrente; *Luis R. Rodríguez Nevárez*, de *Cancio, Rodríguez Nevárez & Sanabria*, abogado de los demandantes y recurridos; *Elí B. Arroyo*, abogado de los codemandados y recurridos.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

Nationwide Mutual Insurance Company (en adelante Nationwide) solicita la revisión de la Sentencia de 24 de junio de 1991 dictada por el antiguo Tribunal Superior de Puerto Rico, Sala de San Juan, en la cual se le condenó a pagar, solidariamente con otros codemandados, la suma total de ciento noventa mil dólares ($190,000) a los demandantes recurridos, José A. Quiñones López (en adelante Quiñones López) y otros, como compensación por los daños y perjuicios sufridos por éstos en relación con la ocurrencia de un accidente de automóviles.

El foro de instancia, además, le impuso a Nationwide la obligación de satisfacer a los codemandados Pedro Manzano Pozas (en adelante Manzano Pozas) y Ana María Sabbagh Thorne (en adelante Sabbagh Thorne) la suma de seis mil dólares ($6,000) por los gastos de abogado en que éstos habían tenido que incurrir como consecuencia de la acción de Nationwide de negarle cubierta y representación legal.

# I

El 12 de junio de 1985 la recurrente, Nationwide, expidió la póliza de seguro de automóvil número 88-271-571 a favor de la Lcda. Ana María Sabbagh cubriendo un vehículo marca Mercury, modelo Cougar del año 1982, *inscrito a nombre de ésta* en el Departamento de Transportación y Obras Públicas. *Dicho automóvil era un bien perteneciente a la sociedad legal de gananciales compuesta por la codemandada Sabbagh Thorne y su esposo, el también codemandado Manzano Pozas.*

La licenciada Sabbagh Thorne había contraído matrimonio con Manzano Pozas el 11 de marzo de 1977, estableciendo el matrimonio su residencia en el número 191 de la Calle O'Neill en Hato Rey, Puerto Rico. Aproximadamente para los meses de mayo o junio de 1985, los referidos cónyuges se separaron, mudándose Manzano Pozas a un apartamento arrendado en el Condominio El Centro en Hato Rey.[1] Sabbagh Thorne, en compañía de su hijo menor de edad, se mantuvo residiendo en la residencia habitual del matrimonio en la mencionada Calle O'Neill en Hato Rey. *El codemandado Manzano Pozas mantenía parte de su ropa en la residencia de la Calle O'Neill y su correspondencia se recibía en dicha dirección. Regularmente visitaba la residencia para compartir con su hijo y asear los perros.*

El 17 de diciembre de 1985, Manzano Pozas fue, por su cuenta, a la residencia familiar con el propósito de utilizar, en gestiones personales, el automóvil Mercury Cougar,[2] *del cual tenía una copia del juego de llaves,* lo que *no* pudo hacer ya que el mismo no funcionó.[3] Manzano Pozas hizo

---

[1] Posteriormente el codemandado Manzano Pozas se mudó a otro apartamento, también arrendado, en el Condominio Torre del Mar, Condado.

[2] El codemandado Manzano Pozas se desempeñaba como Chef de Cocina en el restaurante El Zipperle en Hato Rey y para dicha fecha se encontraba libre de su trabajo.

[3] De acuerdo a lo señalado por el codemandado Manzano Pozas en una declaración jurada que le fuera tomada por Nationwide, el automóvil en cuestión "estar-

uso de un taxi, *tomando luego prestado un automóvil marca Toyota, modelo Célica de 1981, propiedad del señor Manuel Franco, Jr., amigo del codemandado Manzano Pozas.* Cerca de la medianoche del mencionado día, Manzano Pozas salió del restaurante Don Pepe, en el área del Condado, donde estuvo compartiendo con unas amistades; mientras conducía el automóvil marca Toyota, en dirección de este a oeste, por la Avenida F.D. Roosevelt se vio envuelto en un accidente de tránsito donde resultó lesionado el codemandante Quiñones López. Este último, quien salía de la inauguración del Banco Nacional y se dirigía al restaurante El Zipperle, *fue arrollado por Manzano Pozas estando parado en la isleta central que divide los carriles por donde transitan los automóviles en la referida Avenida.* Manzano Pozas fue sometido por agentes de la Policía de Puerto Rico a la prueba de aliento para detectar la presencia de alcohol en su organismo, arrojando un resultado positivo de 0.17% de alcohol en la sangre.[4]

Como consecuencia del accidente, Quiñones López perdió el conocimiento, por lo que fue trasladado al Centro Médico de Río Piedras donde se determinó que tenía *una fractura conminuta desplazada subtrocantérica del fémur,*[5] *debajo del lado izquierdo de la pierna.* Posteriormente, fue transferido al Hospital San Carlos y luego al Hospital Auxilio Mutuo donde se le practicó una *intervención quirúrgica* del subtrocante, colocándole una placa de metal, la cual se le fijó con un total de nueve (9) tornillos.

---

teaba", hacía ruido y el motor daba vueltas vagamente, se aguantaba y no "prendía".

[4] La Ley de Vehículos y Tránsito de Puerto Rico, según enmendada por el Art. 5 de la Ley Núm. 50 de 9 de agosto de 1989 dispone que "[s]i al momento del análisis había en la sangre del conductor diez (10) centésimas de uno (1) por ciento, (.10 de 1%), o más, de alcohol, por volumen (gramos en 100 mililitros avas partes de uno (1) por ciento (1%) por volumen de sangre) se presumirá que el conductor estaba bajo los efectos de bebidas embriagantes al tiempo de cometerse la alegada infracción". 9 L.P.R.A. sec. 1041(b)(2).

[5] Fractura debajo del cuello del fémur (hueso del muslo) en la que el hueso o una parte de él quedan reducidos a fragmentos o esquirlas (pequeña porción o astilla desprendida, parcial o totalmente, de un hueso fracturado o necrosado). *Diccionario Terminológico de Ciencias Médicas*, 12ma ed., Barcelona, Salvat Editores, 1984.

Luego de esta intervención, Quiñones López *permaneció recluido* en su hogar por espacio de seis (6) meses donde recibió un total de ciento cincuenta y seis (156) terapias. Además, utilizó una silla de ruedas por espacio de cinco (5) meses. El 21 de noviembre de 1985 fue sometido a una *segunda intervención quirúrgica* en el Hospital Menonita, Aibonito, Puerto Rico, en la que se le removieron los tornillos que tenía y se le insertó un "Zickel Nail" de trece milímetros (13 mm.) por la punta del trocanter. *Además*, se le realizó un injerto de hueso en el área del subtrocanter.

El 8 de diciembre de 1986, Quiñones López, su esposa, la sociedad de gananciales por ellos compuesta y sus hijos, presentaron demanda contra Manzano Pozas, su esposa Sabbagh Thorne, la sociedad legal de gananciales por éstos compuesta y su compañía aseguradora, reclamándole los daños y perjuicios sufridos como resultado del mencionado accidente.(⁶) El 12 de marzo de 1987 Manzano Pozas y Sabbagh Thorne presentaron contestación a la demanda admitiendo la ocurrencia del accidente, negando el balance de lo alegado y oponiendo defensas afirmativas.

El 4 de junio de 1987, la codemandada Sabbagh Thorne *notificó formalmente* a su aseguradora, Nationwide, sobre la ocurrencia del accidente *y solicitó se le diera cubierta a tenor con los términos de la póliza de seguro, adquirida por ésta para su automóvil Mercury Cougar, ya que la cubierta se extendía a los daños causados por su esposo mientras condujera un automóvil ajeno si el vehículo asegurado se encontraba fuera de uso por desperfectos mecánicos.* Solicitó, *además*, que se le brindara representación legal en el pleito. Nationwide, luego de haberle tomado una declaración jurada al codemandado Manzano Pozas sobre los detalles del accidente y otros extremos, contestó, mediante

---

(⁶) En la demanda original presentada el 8 de diciembre de 1986 figuraban como parte demandada "PEDRO MANZANO POZAS, Y SU ESPOSA JANE DOE, la sociedad legal de gananciales compuesta por ambos, Richard Doe y su esposa Janet Doe y la sociedad legal de gananciales compuesta por ambos y las compañías aseguradoras X y Z". Apéndice, pág. 1.

carta fechada 19 de agosto de 1987, informándole a la co-demandada Sabbagh Thorne que *no* existía cubierta bajo la referida póliza de seguro *dado el caso de que su esposo y ella estaban separados a la fecha del accidente y la póliza sólo se extendía a aquellas personas que vivieran en el hogar de la asegurada nombrada.* Adicionalmente, Nationwide se negó a ofrecerle la representación legal solicitada. En consecuencia, Manzano Pozas y Sabbagh Thorne tuvieron que asumir los costos de su representación en el caso de autos.

El 28 de julio de 1987, los demandantes *enmendaron* la demanda a tenor con la Regla 15.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, para hacer constar el nombre de la aseguradora Nationwide quien había sido incluida en la misma con nombre ficticio. Luego de haber sido debidamente emplazada el 20 de agosto de 1987, Nationwide contestó la demanda el 28 de septiembre de 1987, *negando* su responsabilidad. El 17 de noviembre de 1987, Manzano Pozas y Sabbagh Thorne presentaron *demanda de coparte* contra Nationwide y ésta contestó la misma el 1ro de diciembre de 1987, *negando* responsabilidad.[7]

Finalmente, el 24 de junio de 1991 el antiguo Tribunal Superior de Puerto Rico, Sala de San Juan, dictó *sentencia* declarando *con* lugar la demanda, condenando a los demandados, *de manera solidaria*, a satisfacer a los demandantes la suma total de $190,000.[8] Declaró, *además*, el

---

[7] En dicha demanda contra coparte se solicitaba del tribunal "una declaración de que la co-demandada Nationwide Mutual Insurance Co. tiene la obligación de dar cubierta y defensa a los comparecientes, que su negativa a ello ha producido y continúa produciendo angustias mentales a los comparecientes en una suma no menor de $25,000.00 para cada uno y que dicha aseguradora debe pagar los honorarios de abogado del suscribiente". Apéndice Z, pág. 13.

[8] Dicha suma se desglosa de la siguiente manera:

a) José A. Quiñones López $150,000

b) Doris Zoraida Rivera 25,000

c) Antonio José, Doris Julia y Zoraida Jasmín, cada uno 5,000

foro de instancia *con* lugar la demanda de coparte condenando a la codemandada Nationwide a pagar a los codemandados Manzano Pozas y Sabbagh Thorne la suma de seis mil dólares ($6,000) como pago por los gastos incurridos en su representación legal.[9]

Inconforme, Nationwide acudió en revisión ante este Tribunal. En el recurso que a esos efectos radicara, le imputa al foro de instancia haber errado:

[1.] ... AL CONCLUIR QUE LA POLIZA DE NATIONWIDE MUTUAL INSURANCE COMPANY CUBRIA EL VEHICULO ENVUELTO EN EL ACCIDENTE Y QUE ESTA NO PODIA NEGAR CUBIERTA NI REPRESENTACION LEGAL.
[2.] ... AL ENCONTRAR A LA CODEMANDADA ANA MARIA SABBAGH THORNE SOLIDARIAMENTE RESPONSABLE POR EL ACCIDENTE.
[3.] ... AL CONDENAR A NATIONWIDE MUTUAL INSURANCE COMPANY A PAGAR DAÑOS EN EXCESO DE LOS LIMITES DE SU CUBIERTA.
[4.] ... AL NO APLICAR LA DOCTRINA DE NEGLIGENCIA COMPARADA Y AL VALORAR LOS DAÑOS EXCESIVAMENTE. Solicitud de revisión, pág. 7.

Habiendo comparecido las partes y estando en posición de resolver el recurso, procedemos a así hacerlo.

## II

En relación con los errores primero y segundo señalados por la recurrente, ésta sostiene que erró el tribunal sentenciador al concluir que la póliza de seguro expedida por Nationwide, a favor de la codemandada Sabbagh Thorne, cubría el vehículo envuelto en el accidente causado por su esposo, Manzano Pozas, al conducir un vehículo de motor perteneciente a un tercero. Su *contención principal* descansa en el hecho de que en la referida póliza se *estipula* que la misma incluye al cónyuge, *únicamente* si éste vive

---

[9] Copia de esta sentencia le fue notificada a las partes con fecha de 9 de julio de 1991.

"bajo el mismo techo" que la asegurada nombrada en primer término.([10])

Mediante el convenio de seguro suscrito entre Sabbagh Thorne y Nationwide, denominado "Póliza de Automóvil Century II de Nationwide",([11]) esta última se comprometió, a cambio del pago por adelantado de las primas, en las cantidades requeridas y bajo los términos y condiciones de la póliza, a proveer las cubiertas seleccionadas por la primera.([12]) En el caso de autos la póliza seleccionada por Sabbagh Thorne incluía, entre otras, *una cubierta de responsabilidad civil por daños a la propiedad ajena y lesiones corporales*. El contrato disponía sobre este particular como sigue:

*CUBIERTA DE RESPONSABILIDAD CIVIL POR DAÑOS A LA PROPIEDAD AJENA Y LESIONES CORPORALES*[.] Bajo esta cubierta, si usted viene obligado legalmente a pagar daños que resulten de la posesión, mantenimiento, uso, carga o descarga del automóvil suyo, *nosotros* pagaremos por tales daños. *Cualquier persona que viva en el hogar suyo está protegida.* También está protegida cualquier persona o asociación *legalmente responsable* por el uso del automóvil suyo y que lo use con el permiso suyo. El permiso puede ser implícito o expreso. (Énfasis suplido y en el original.) Apéndice, pág. 96.

Bajo la sección de "Definiciones" de la póliza en cuestión quedan definidos los siguientes términos:

---

([10]) Dicha contención, y posición, parte de la premisa de que en el presente caso la asegurada, la licenciada Sabbagh Thorne, *no* había autorizado a su esposo, el codemandado Manzano Pozas, a utilizar "su vehículo", hecho sobre el cual, sostiene Nationwide, no desfiló prueba alguna en instancia.

([11]) El seguro de vehículos, según definido en el Código de Seguros, " 'es el seguro contra la pérdida o los daños causados a un vehículo terrestre o aeronave o cualquier animal de tiro o de montura, o de propiedad mientras estuviere en los mismos o sobre los mismos, o cargándose en los mismos o descargándose de ellos, por cualquier riesgo o causa, y contra cualquier pérdida, gasto o responsabilidad por la pérdida o los daños causados a personas o la propiedad, resultantes de la posesión, conservación, o uso de cualquiera de dichos vehículos, aeronaves o animales, o incidentales a los mismos'. Código de Seguros, Art. 4.07 del Código de Seguros de Puerto Rico, 26 L.P.R.A sec. 407". *Coop. Seguros Múltiples de P.R. v. Lugo*, 136 D.P.R. 203, 210 (1994).

([12]) La póliza adquirida en virtud de este contrato de seguro sería efectiva a partir del 12 de junio de 1985 hasta el 12 de junio de 1986.

[(a)] ... "USTED" Y "SUYO" significan o se refieren al asegurado nombrado en primer término en las Declaraciones adheridas, *e incluyen al cónyuge de ese asegurado si vive bajo el mismo techo.*
[(b)] ... "NOSOTROS", "NOS", "NUESTROS" y "LA COMPAÑIA" significan o se refieren a Nationwide Mutual Insurance Co.
[(c)] ... "EL ASEGURADO", "UN ASEGURADO" y "CUALQUIER ASEGURADO" significan o se refieren a personas y asociaciones específicamente indicadas con derecho a protección bajo la cubierta que se esté describiendo. Apéndice, pág. 95.

La referida póliza contiene una disposición *para extender* la cubierta de responsabilidad civil al uso de *otros* vehículos de motor que no sea el vehículo propiedad del asegurado nombrado en primer término. Dicha disposición, titulada "Extensiones de Cubierta", establece en lo pertinente lo siguiente:

*USO DE OTROS VEHICULOS DE MOTOR*[.] Las cubiertas de Daños a la Propiedad Ajena y Lesiones Corporales de su seguro de automóvil *cubren también ciertos otros vehículos:*
1. *Aplica a un vehículo de motor que no sea propiedad suya mientras sustituya temporalmente su automóvil. Su automóvil tiene que estar fuera de uso debido a desperfectos mecánicos, reparación, recibiendo servicio de mantenimiento, pérdida o destrucción.*

. . . . . . . .

3. *Aplica a un vehículo de motor perteneciente a cualquier persona que no sea un miembro de su hogar. La protección aplica únicamente mientras dicho automóvil está siendo usado por usted o por cualquier pariente viviendo en su hogar.* Esta protección aplica únicamente a pólizas emitidas a individuos (no a asociaciones). Protege al usuario y a cualquier persona o asociación que no sea dueña del vehículo pero que sea responsable de su uso. La protección no se extiende a pérdidas:
 a) que envuelvan el uso del vehículo en la ocupación o negocio suyo o de parientes que vivan en el hogar suyo, excepto un automóvil privado de pasajeros usado por usted, su ch[o]fer o empleado doméstico.
 b) que ocurran mientras el vehículo es proporcionado a usted o a un miembro de su hogar para uso regular. (Énfasis suplido y en el original.) Apéndice, pág. 97.

De acuerdo con las antes transcritas cláusulas, para ser acreedor de la cubierta extendida contemplada en el contrato de seguro suscrito entre la codemandada Sabbagh Thorne y Nationwide, *Manzano Pozas tiene que cumplir con por lo menos tres (3) requisitos, a saber*: (a) ser cónyuge del asegurado nombrado en primer término; (b) vivir bajo el mismo techo que el asegurado nombrado en primer término, y (c) haber utilizado un vehículo de motor, que no sea propiedad suya ni del asegurado nombrado en primer término, mientras el automóvil asegurado estuviera fuera de uso debido a desperfectos mecánicos, reparación, recibiendo servicio de mantenimiento, perdida o destrucción.

■ No tenemos dudas con relación a que el codemandado Manzano Pozas satisface el primer y tercer requisito de los antes expresados. Es decir, al momento de la ocurrencia del accidente, Manzano Pozas y Sabbagh Thorne estaban casados entre sí y el vehículo conducido por éste pertenecía a un tercero. Dicho vehículo estaba siendo utilizado por Manzano Pozas. en sustitución del automóvil asegurado ya que este último estaba fuera de uso debido a desperfectos mecánicos. Así lo concluyó inequívocamente el tribunal sentenciador tomando como base para ello la prueba que le mereció entero crédito. Es norma claramente establecida por este Tribunal que en ausencia de error manifiesto, pasión, prejuicio o parcialidad *no* intervendremos a nivel apelativo con las determinaciones de hecho y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. *Pueblo v. Pintos Lugo*, 131 D.P.R. 1015 (1992); *Pueblo v. Rodríguez Román*, 128 D.P.R. 121 (1991); *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975); *Rodríguez v. Concreto Mixto, Inc.*, 98 D.P.R. 579 (1970).[13]

---

[13] Nationwide sostiene que a falta de prueba de que el vehículo asegurado estaba siendo reparado por mecánicos *bona fide* o se le estaba dando mantenimiento *bona fide*, no procedía concluir que el vehículo estaba fuera de servicio. Aceptar la tesis propuesta por la demandada recurrente, significaría llegar al extremo de resol-

*Ahora bien*, a la fecha del accidente Manzano Pozas y Sabbagh Thorne estaban separados y residían en distintas viviendas cada uno, por lo que está en controversia si el codemandado Manzano Pozas cumple con el *segundo* de los requisitos que hemos enumerado. *En consecuencia, la controversia principal en el presente recurso se ciñe a delimitar el alcance de la frase "si vive bajo el mismo techo", o "viviendo en su hogar", según utilizadas en la póliza, con el propósito de determinar si las mismas necesariamente implican convivencia física en la misma residencia, estructura o edificación, al momento de la ocurrencia del accidente.*

El alcance de este lenguaje, tan comúnmente utilizado en la industria de seguros, *no ha sido anteriormente definido en nuestra jurisdicción. Nos corresponde hacerlo ahora.*

## III

■ Los contratos de seguros de responsabilidad civil, en general, "tienen como fin primordial 'garantiza[r] al asegurado contra la responsabilidad civil en que pueda incurrir ante terceros por actos de los que sea [legalmente] responsable'. J. Castelo Matrán, *Diccionario Mapfre de Seguros*, Editorial Mapfre, 1988, pág. 264. El asegurador se obliga, dentro de los límites establecidos en el contrato, a cubrir la obligación de indemnizar a un tercero por los daños y perjuicios causados por el asegurado. Como puede

---

ver que como requisito previo —sine qua non— a la sustitución del vehículo asegurado es necesario que dicho vehículo sea trasladado a un taller de mecánica o de servicio para que reciba atención *bona fide. No estamos de acuerdo.*

Basta señalar que en las jurisdicciones estatales norteamericanas se ha resuelto que un defecto o mal funcionamiento de uno de los componentes principales de un automóvil —tales como el motor que no arranca (*dead engine*), pararse o ahogarse el motor frecuentemente (*frequent stalling*), o llantas en mal estado (*bad tires*)— que lo hagan inoperable o provoquen que su operación constituya un riesgo, pueden constituir, de acuerdo a las circunstancias presentes en cada caso, una avería dentro del significado de una cláusula de sustitución. Anotación, *Construction and Application of Substitution Provision of Automobile Liability Policy*, 42 A.L.R. 1145 (1985).

suponerse, sin embargo, en la práctica no existe un seguro que cobije toda la responsabilidad en que puede incurrir una persona. Lo que existe son seguros de responsabilidad civil que cubren *determinadas* actividades del asegurado, capaces de producir daños. Entre los más conocidos figuran, por ejemplo, el seguro de responsabilidad de automóviles [como el que nos ocupa] (que versa sobre los daños que el uso de un vehículo de motor pueda causar a terceros) y los seguros de responsabilidad profesional concernientes a los perjuicios ocasionados a otros en el desempeño de una profesión: medicina, abogacía, arquitectura, etc". (Énfasis suplido y escolio omitido.) *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521, 537 (1991).

■ Un contrato de seguros, al igual que todo otro contrato, constituye la *ley entre las partes* siempre que concurran las *tres* (3) condiciones esenciales para su validez, Art. 1230 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3451; cuales son: *consentimiento* de los contratantes, *objeto cierto* que sea materia del contrato, y *causa* de la obligación que se establezca. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. Ambas partes, asegurador y asegurado, se obligan a cumplir con los términos y condiciones de la póliza. *Torres v. E.L.A.*, 130 D.P.R. 640 (1992).[14]

■ Dispone el Código de Seguros de Puerto Rico que todo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta. Código de Seguros, Art. 11.250 (26 L.P.R.A. sec. 1125). *Meléndez Piñero v. Levitt & Sons of P.R.*, ante.[15]

No debemos, sin embargo, perder de vista el hecho de

[14] Véase 1 *Couch on Insurance 2d* Sec. 1:1 (1961).

[15] En adición, véanse los Arts. 1233–1241 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 3471–3479.

que en caso de dudas en la interpretación de una póliza, ésta debe resolverse de modo que se realice el propósito de la misma: proveer protección al asegurado.([16]) Es por eso que no se favorecerán las interpretaciones sutiles que le permitan a las compañías aseguradoras evadir su responsabilidad. Corresponde a los tribunales buscar el sentido y significado que a las palabras de la póliza en controversia le daría una persona normal de inteligencia promedio que fuese a comprar la misma. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 D.P.R. 881 (1994); *Barreras v. Santana*, 87 D.P.R. 227 (1963). No debe atenderse demasiado al rigor gramatical, sino al uso general popular de las voces, de manera que lo contratos de seguro sean entendidos e interpretados en su más corriente y usual significado. *Marín v. American Int'l Ins. Co. of P.R.*, 137 D.P.R. 356 (1994); *Pagán Caraballo v. Silva, Ortiz*, 122 D.P.R. 105 (1988).

Como regla general, los contratos de seguro, por ser considerados contratos de adhesión,([17]) se interpretan liberalmente a favor del asegurado. *Rosario v. Atl. Southern Ins. Co. of P.R.*, 95 D.P.R. 759 (1968); *Barreras v. Santana*, ante; *Aparicio v. Asoc. de Maestros*, 73 D.P.R. 596 (1952). Ahora bien, esta norma *no* tiene el efecto de obligar a que se interprete a favor del asegurado una cláusula que favorece al asegurador y cuyo significado y alcance es claro y libre de ambigüedad. *Torres v. E.L.A.*, ante; *González v. Coop. Seguros de Vida de P.R.*, 117 D.P.R. 659 (1986); *Casanova v. P.R.-Amer. Ins. Co.*, 106 D.P.R. 689 (1978); *Rivera v. Insurance Co. of P.R.*, 103 D.P.R. 91 (1974). En tales situaciones la misma debe considerarse obligatoria para el asegurado. *Casanova v. P.R.-Amer. Ins. Co.*, ante. De igual

---

([16]) Véanse: *Barreras v. Santana*, 87 D.P.R. 227 (1963); *Travelers Insurance Company v. Smith*, 328 So. 2d 870 (1976); 7 Am Juris 2d, pág. 447.

([17]) Un contrato de adhesión es aquel en que una sola de las partes dicta las condiciones del contrato, condiciones que ha de aceptar la otra parte contratante. *Zequeira v. C.R.U.V.*, 83 D.P.R. 878 (1961).

forma, las cláusulas de exclusión —que de ordinario no son favorecidas— en un contrato de seguro deben ser interpretadas restrictivamente en contra del asegurador. *Rivera v. Insurance Co. of P.R.*, ante.

■ En resumen, cuando los términos, condiciones y exclusiones de un contrato de seguros —que es ley entre las partes— son claros, específicos y no dan margen a ambigüedades o diferentes interpretaciones, debe hacerse valer los mismos de conformidad con la voluntad de las partes. En ausencia de ambigüedad, las cláusulas del contrato son obligatorias para las partes. *García Curbelo v. A.F.F.*, 127 D.P.R. 747 (1991).

## IV

La codemandada-recurrente, Nationwide, argumenta que la frase "vivir bajo el mismo techo", según utilizada en la póliza, "claramente quiere decir en la misma residencia". Solicitud de revisión, pág. 9. Añade, que "[e]l uso del término 'cónyuge' claramente quiere decir que se contempla que se trata del esposo o la esposa, según sea el caso, y el hecho de que están legalmente casados no tiene efecto alguno si no viven bajo el mismo techo, es decir juntos en la misma residencia" (íd.); razón por la cual, argumenta y sostiene Nationwide, que la póliza expedida por dicha compañía en el presente caso no cubre el accidente en controversia en vista del hecho de que Manzano Pozas, no obstante ser el cónyuge de su asegurada Sabbagh, *no* vivía con ésta bajo el mismo techo *al momento de la ocurrencia* del accidente.

No hay duda que, *de primera intención*, el argumento impresiona e impacta; esto es, una interpretación *estrictamente literal*, basada la misma únicamente en el rigor gramatical de los términos o palabras utilizadas en la póliza, parece llevarnos inexorablemente a esa conclusión. *Ello no*

*obstante,* un análisis ponderado de la situación nos convence de que *no* podemos interpretar, de manera estrictamente literal, los referidos términos y palabras. Se nos ocurre pensar en una serie de situaciones en que dicha interpretación literal nos conducirá no sólo a un resultado incorrecto sino que a la comisión de una injusticia. Meramente a manera de ejemplo, tenemos la situación en que uno de los cónyuges podría no estar viviendo "bajo el mismo techo", a la fecha de la ocurrencia del accidente, y, por el contrario, estar "residiendo" fuera de su hogar e, inclusive, fuera de Puerto Rico, por razón, digamos, de enfermedad, o de estudios o de servicio militar. Sería absurdo, y constituiría una injusticia, repetimos, que en cualesquiera de las antes mencionadas situaciones aplicáramos literalmente los términos en controversia y permitiéramos la denegación de cubierta.

De manera, pues, que una vez descartamos —*por necesidad*— la aplicación o interpretación literal de las palabras, o términos, que a esos efectos contiene la póliza de seguro en controversia en el presente caso, nos percatamos del hecho de que, aun en situaciones como las que presenta el mismo —casos de separación temporal de los cónyuges— *tampoco* podemos aplicar dichos términos de manera literal. Ello por cuanto no tenemos duda de que el así hacerlo nos conduciría, *igualmente,* a resultados incorrectos e injustos.

■ Según expresamos en *Meléndez Piñero v. Levitt & Sons of P.R.,* ante, pág. 535, "[n]o hay duda del hecho de que las pólizas de seguro que son vendidas en Puerto Rico son, de ordinario, las 'pólizas modelos' de los distintos tipos de seguro que venden en los Estados Unidos las compañías aseguradoras. *Ello hace que la jurisprudencia federal y estatal interpretativa de las mismas tengan una obvia utili-*

*dad y un gran valor persuasivo en nuestra jurisdicción."*([18]) (Énfasis suplido.)

■ En la jurisdicción norteamericana, la tendencia de los tribunales es, *como una cuestión de política pública*, a conceder la *máxima extensión* de la cubierta de los contratos de seguro, especialmente durante la existencia legal del vínculo matrimonial, en situaciones tales como la del caso de autos. *State Auto Property and Cas. v. Gibbs*, 444 S.E.2d 504 (1994); *Reserve Ins. Co. v. Apps.*, 149 Cal.Rptr. 223 (1978); *Hobbs v. Fireman's Fund Am. Ins. Companies*, 339 So. 2d 28 (1976); *Hawaiian Ins. & G. C., LTD. v. Federate Amer. Ins. Co.*, 534 P.2d 48 (Wash. 1975); *Hartford Insurance Group v. Winkler*, 508 P.2d 8 (Nev. 1973); *Aetna Casualty and Surety Company v. Miller*, 276 F. Supp. 341 (D. Kan. 1967); *Zurich Co. v. Monarch Co.*, 230 A.2d 330 (1967); *Lumbermens Mut. Cas. Co. v. Continental Cas. Co.*, 387 P.2d 104 (Alaska 1963).([19])

---

([18]) No obstante, "[d]ebido a las revisiones en los términos y el lenguaje de la póliza, y debido a que una póliza en particular puede desviarse de los patrones adoptados comúnmente, los casos que interpretan la cubierta del referido seguro no son autoridad persuasiva si no envuelven el mismo lenguaje o el mismo modelo de la póliza que se examina". (Énfasis suprimido.) *Meléndez Piñero v. Levitt & Sons of P.R.*, 129 D.P.R. 521, 535 (1991). Además, no debemos olvidar "que nuestro ordenamiento codifica sustantivamente tanto el Contrato de Seguro, Art. 11.010 y ss. del Código de Seguros, 26 L.P.R.A. secs. 1101–1137, como los principios básicos que rigen su interpretación, 26 L.P.R.A. sec. 1125 y Arts. 1233–1241 del Código Civil, 31 L.P.R.A. sec. 3471–3479". Íd.

([19]) En *State Auto Property and Cas. v. Gibbs*, 444 S.E.2d 504 (1994), los cónyuges al momento de la ocurrencia del accidente se encontraban residiendo en viviendas separadas. El accidente tuvo lugar mientras el marido conducía, en estado de embriaguez, el automóvil de su esposa. Al momento de hacer la reclamación a sus respectivas aseguradoras ambos ofrecieron direcciones distintas y la esposa indicó que era soltera (*single*). El tribunal, aun existiendo evidencia conflictiva, resolvió que para efectos de la póliza de seguro expedida a favor de la esposa, el marido era miembro de su hogar y, por ende, un asegurado dentro de los términos de la cubierta.

En *Reserve Ins. Co. v. Apps.*, 149 Cal.Rptr. 223 (1978), los cónyuges se encontraban separados, residiendo en distintos lugares. El tribunal, en consideración al hecho de que el marido mantenía la mayor parte de su ropa en la residencia de su esposa y recibía su correspondencia en la dirección de ésta, concluyó que, no empece a la separación, la esposa quedaba protegida bajo la cubierta extendida de la póliza de seguro emitida a favor de su marido.

En *Hobbs v. Fireman's Fund Am. Ins. Companies*, 339 So. 2d 28 (1976), los cónyuges estaban separados y residían en estados diferentes. El tribunal reconoció la existencia de cubierta al considerar que era evidente la intención de las partes de

No obstante, no se ha formulado una regla general de aplicación automática para resolver tales situaciones; *en otras palabras, la "regla general" es precisamente a los efec-*

llevar a cabo una reconciliación; esto, unido al hecho de que el asegurado nombrado sostenía económicamente al cónyuge accidentado y que al momento de adquirir la póliza en cuestión los cónyuges residían juntos, por lo que razonablemente la intención era que ambos quedaran cubiertos bajo las disposiciones de la misma.

En *Hawaiian Ins. & G. Co., LTD. v. Federated Amer. Ins. Co.*, 534 P.2d 48 (Wash. 1975), el tribunal, teniendo en cuenta la política pública en favor de que se extienda cubierta a ambos cónyuges durante la existencia legal de su matrimonio y el hecho de que existía la posibilidad de una reconciliación, resolvió que la cláusula en controversia debía interpretarse liberalmente a favor del asegurado y en contra del asegurador. En consecuencia, extendió la cubierta en protección del cónyuge del asegurado nombrado.

En *Hartford Insurance Group v. Winkler*, 508 P.2d 8 (Nev. 1973) los cónyuges se encontraban separados y estaba pendiente una acción de divorcio al momento de ocurrir el accidente. El tribunal determinó que el tribunal sentenciador había concluido correctamente que cuando la esposa reside en el hogar con su marido al momento de expedirse la póliza y ésta guarda silencio sobre en que momento es que la misma tiene que vivir en el hogar del asegurado nombrado, la esposa cualifica como asegurada nombrada mientras continúe casada con su cónyuge.

En *Aetna Casualty and Surety Company v. Miller*, 276 F. Supp. 341 (D. Kan. 1967), al igual que en *Hartford*, ante, los cónyuges se encontraban separados y estaba pendiente una acción de divorcio al tiempo de ocurrir el accidente. Ambos cónyuges residían en diferentes estados y se veían ocasionalmente con el propósito de que el marido pudiera compartir con los hijos habidos en el matrimonio, sin embargo no mantenían un hogar común. El tribunal concluyó que a los fines de la póliza emitida por la aseguradora, la esposa vivía en el mismo hogar que el marido y por consiguiente estaba cubierta por ésta.

En *Zurich Insurance Co. v. Monarch Insurance Co.*, 230 A.2d 330 (1967), los cónyuges, separados al momento de la ocurrencia del accidente, se reconciliaron en fecha posterior a éste. En consideración al hecho de la reconciliación y de que durante el tiempo que duró la separación el cónyuge asegurado continuó utilizando la residencia de su esposa como su dirección legal, el tribunal determinó que la esposa era residente del hogar de su marido, no obstante haber estado separados al momento de ocurrir el accidente.

En *Lumbermens Mut. Cas. Co. v. Continental Cas. Co.*, 387 P.2d 104 (Alaska 1963), el tribunal resolvió que una esposa que ha iniciado un procedimiento de divorcio y que reside con su hijo en la vivienda habitual de la familia mientras su esposo, el asegurado nombrado, pernocta e ingiere alimentos fuera del mismo, y que intenta una reconciliación, vive en el mismo hogar que su marido en relación a la póliza de seguro de éste. En este caso, el cónyuge asegurado visitaba el hogar familiar varias veces a la semana y pasaba en él los domingos. En adición, pagaba la casa y el uso de utilidades. Igualmente, compraba todos los comestibles utilizados por su esposa e hijo y ocacionalmente los llevaba a cenar fuera de la casa.

Para situaciones en que se ha resuelto de forma contraria, véase *Government Emp. Ins. v. Allstate Ins.*, 369 S.E.2d 181 (1988); *Grange Mut. Cas. Co. v. State Auto. Mut. Ins.*, 468 N.E.2d 909 (1983); *Robertson v. Lubermen's Mut. Cas. Co.*, 286 S.E.2d 305 (1981), revocado por *Grange Mut. Cas. Co. v. Brinkley*, 355 S.E.2d 767 (1987); *Marlowe v. Reliance Insurance Company*, 190 S.E.2d 417, *cert.* denegado, 191 S.E.2d 602 (1972); *Firemen's Insurance Co. of New York v. Burch*, 426 S.W.2d 306, reafirmado en parte y anulado en parte en otros asuntos, 442 S.W.2d 331 (1968); *Agee v. Travelers Indemnity Company*, 396 F.2d 57 (10mo Cir. 1968).

*tos de que estas controversias han de resolverse caso a caso a la luz de los hechos particulares y específicos de cada uno.* Esto es, los hechos de cada caso en particular tienen que ser examinados con el propósito de determinar cuándo el asegurado nombrado o su cónyuge es, o deja de ser, residente del mismo techo para efectos de esta clase de póliza de seguro.

El *principio rector* que gobierna la determinación de extender cubierta bajo una póliza de seguro como la de autos, de acuerdo a la tendencia mayoritaria norteamericana, *lo es la intención que tuvo el cónyuge al momento de dejar la residencia familiar.* Esto es, si la intención es que la separación sea definitiva, con visos de permanencia, en cuya situación se deniega la cubierta, o, por el contrario, si se trata de una separación provisional, de carácter temporero, con la intención de retornar a la residencia conyugal eventualmente, en la cual situación se le brinda cubierta.

En la determinación de hacer, o no, extensiva la cubierta en cuestión, pueden resultar de gran ayuda factores o criterios tales como: (a) si al momento de ocurrir el accidente la relación entre los cónyuges es cordial u hostil; (b) si existe la posibilidad de una reconciliación entre los cónyuges de manera que se retorne a la residencia habitual del matrimonio; (c) si el cónyuge físicamente ausente aporta económicamente al sostenimiento del hogar conyugal o depende para su subsistencia del otro cónyuge, (d) y el tiempo que pasan juntos realizando actividades propias de un matrimonio.

Ninguno de los criterios antes mencionados, por sí sólo, es suficiente para concluir que el cónyuge —el cual, al momento del accidente, residía aparte— continúa viviendo "bajo el mismo techo" que el asegurado nombrado. Tampoco es necesaria la concurrencia de todos ellos en una misma situación fáctica. *Es la combinación de todos, o de algunos de ellos, la que puede conducir al juzgador a tal*

*determinación.* Por otro lado, debe quedar claro que la mera existencia legal de un vínculo matrimonial, por sí sola, no tiene el efecto de extender automáticamente la cubierta de una póliza de seguros en situaciones como la que nos ocupa.

Examinamos la situación en el caso de autos a la luz de los criterios antes esbozados.[20] Los codemandados Sabbagh Thorne y Manzano Pozas, casados entre sí, se separaron por razón de haber experimentado problemas en su relación matrimonial. A pesar de la existencia de tales problemas, *y conforme lo determinó el tribunal de instancia*, ambos estaban explorando la posibilidad de una reconciliación y la relación entre estos era una cordial.[21] El codemandado Manzano Pozas mantenía parte de su ropa en la residencia de la Calle O'Neill 191 —donde residió junto a la codemandada Sabbagh Thorne y donde ésta continúa residiendo en compañía del hijo habido en el matrimonio— y su correspondencia principal la recibía en dicha dirección.[22] Además, Manzano Pozas regularmente visitaba dicha residencia con el propósito de compartir con su hijo y bañar a los perros.[23]

De la totalidad de las circunstancias presentes en el caso de autos, puede razonablemente concluirse que la intención del codemandado Manzano Pozas al dejar la residencia conyugal no era crear una situación de separación definitiva, de carácter permanente, sino una separación temporal con miras de retornar al hogar posteriormente una vez fuesen limadas las asperezas y zanjadas las diferencias habidas entre ambos. Por otro lado, el carro "sustituido" por Manzano Pozas —Mercury Cougar de 1982— no

---

[20] Ello, repetimos, en ausencia de prueba de que la codemandada Sabbagh Thorne no había autorizado al codemandado Manzano Pozas a utilizar el vehículo asegurado.

[21] Véase la determinación de hechos número 29, Sentencia de 24 de junio de 1991, Solicitud de Revisión, Apéndice, págs. 32–33.

[22] Apéndice, pág. 33.

[23] Íd.

obstante estar inscrito a nombre de la codemandada Sabbagh Thorne, y, en consecuencia, ser ésta la "asegurada nombrada" en la póliza de seguros expedida por Nationwide, era un bien ganancial.

Siendo ello así, existiendo la posibilidad de una reconciliación entre ambos codemandados y estando presentes varios de los factores antes enumerados, forzoso es concluir que el codemandado Manzano Pozas "vive bajo el mismo techo" o "en el hogar" de la codemandada Sabbagh Thorne, conforme el lenguaje utilizado en la póliza de seguro expedida por Nationwide a favor de Sabbagh Thorne. En consecuencia, *resolvemos* que debe extenderse la cubierta en el caso de autos para ofrecer protección a ambos codemandados, de éstos o uno de éstos resultar legalmente responsable de los daños sufridos por la parte demandante.

## V

La conclusión a la que hemos llegado *no* dispone en su totalidad de la presente controversia. Nos resta aún determinar si efectivamente la póliza emitida por Nationwide a favor de Sabbagh Thorne cubría el vehículo envuelto en el accidente. Dicha determinación depende de la forma en que se llevó a cabo la sustitución del vehículo descrito en, y asegurado por, la referida póliza.

Según indicáramos anteriormente, la póliza en controversia contiene una disposición que hace extensiva la cubierta, que mediante ella se ofrece, al uso de otro vehículo de motor que no sea el vehículo asegurado.[24] Ahora bien, nada aparece en la póliza que indique el modo o forma en

---

[24] Sobre la cubierta bajo una cláusula de sustitución de esta naturaleza, 2 *Couch on Insurance 2d (Ed. rev.)* Secs. 45:219–45:221, indica:

"The typical 'substitution' provision provides coverage while a substituted vehicle not owned by the insured is being temporarily used, where the described automobile is withdrawn from normal use because of its breakdown, repair, servicing, loss, or destruction. It indicates the intention of the insurer to cover only one automobile of the insured and to avoid covering more than one automobile for a single premium.

que debe efectuarse la sustitución del automóvil asegurado. La codemandada recurrente, Nationwide, argumenta que es el asegurado nombrado, *o algún pariente viviendo bajo el mismo techo que hubiere estado usando el vehículo asegurado y se le dañara durante dicho uso*, quienes *únicamente* pueden sustituirlo. Sostiene que por razón de que Manzano Pozas *"no* era el asegurado nombrado y *no* era cónyuge ni pariente viviendo bajo el mismo techo ... no tenía autorización ni derecho de clase alguno para sustituir el vehículo asegurado con otro propiedad de un tercero."[25] (Énfasis en el original.) Solicitud de revisión, págs. 10–11.

En relación a quienes tienen autoridad para sustituir el vehículo asegurado, bajo una cláusula como ésta, señala Gordis, *Property and Casualty Insurance*, 1984, pág. 484, que:

"Its purpose is not to narrow or defeat coverage but to make the coverage reasonably definite as to the vehicles the insured intended normally to use, while at the same time permitting him to continue to drive should the particular vehicle named be temporarily out of commission, thus enabling the insurer to issue a policy upon a rate fair to both insured and insurer, rather than one at a prohibitive premium for blanket coverage of any and all vehicles which the insured might own or operate.

"The purpose is to give the insured additional temporary coverage when the insured can not use his vehicle scheduled under the policy. It is generally also required that the substitute vehicle not be owned by the insured; if such coverage was ordinarily extended, the insurer would be covering an uninsured vehicle for a single premium in lieu of the insured taking out separate coverage for his automobiles.

. . . . . . .

"A substitute coverage clause is for the benefit of the insured. Accordingly, if any construction is required of a substitute clause, it should be for his benefit. At the same time, ambiguity is not to be found where none exists, and the contract must be interpreted as written, and the substitution provision is neither to be unreasonably extended to materially increase the risk contemplated by the insurer, nor is it to be narrowly applied against the insured, inasmuch as the clause is designed for his protection. It was found that no coverage existed where policy clearly defined the term 'owned vehicle' so that an owned uninsured vehicle was not within the scope of the temporary substitute coverage."

[25] Nationwide señala que "[l]a asegurada nombrada, licenciada Sabbagh, *nunca* autorizó el uso del vehículo asegurado, *nunca* autorizó su sustitución y *nunca* tuvo el vehículo sustituto bajo su posesión y control". (Énfasis suplido.) Solicitud de revisión, pág. 12. Sin embargo, nótese el hecho de que el codemandado Manzano Pozas, a pesar de estar separado de su esposa, la codemandada Sabbagh Thorne, conservaba en su posesión una copia del juego de llaves correspondientes al vehículo asegurado, *propiedad de la sociedad legal de gananciales compuesta por ambos*, sin que surja nada en el record indicativo de la objeción de aquélla o de su desconocimiento sobre tal situación.

*Drive Other Cars* - The policy will cover the Insured, his spouse and resident relatives while driving *any other automobile.* Similarly, the policy will cover such other persons or organization legally responsible for the Insured's using of any automobile, except one which is owned or hired by the person or organization.

*Drive Other Car Exclusions* - As respects the use of other automobiles, the intent of the policy is to cover only such automobiles as are not furnished or available for regular use. The policy specifically excludes any other automobile owned by the Insured or a member of his household, as it is contemplated that such automobiles will be insured at the appropriate premium for the coverage. Also excluded is any automobile other than a temporary substitute automobile... owned by or furnished for regular use to the insured or a member of his household other than a domestic servant.

3. *Temporary Substitute Automobile* - If the automobile described in the policy is withdrawn from service while it is being repaired or serviced, or during a period when it has been lost or wrecked, the policy covers the use of any other automobile which is being used temporarily as a substitute for the withdrawn vehicle provided the Insured does not own the automobile. No notice of the substitution is required and no additional premium is charged. (Énfasis en el original.)

En el caso de autos, se impone la conclusión de que el codemandado Manzano Pozas tenía la autoridad necesaria para llevar a cabo la sustitución del automóvil asegurado. Ello así, ya que al momento de la ocurrencia del accidente éste, *conforme hemos resuelto,* "vivía en el hogar" de la asegurada nombrada —su cónyuge— *y según acepta la codemandada recurrente, Nationwide, es el asegurado nombrado, o algún pariente "viviendo bajo el mismo techo", quienes únicamente pueden llevar a cabo la sustitución.* En consecuencia, la póliza expedida por Nationwide, efectivamente cubría el vehículo sustituto envuelto en el accidente protagonizado por el codemandado Manzano Pozas. *No* erró, en consecuencia, el tribunal sentenciador al así concluirlo.

# VI

La codemandada recurrente, Nationwide, como parte de su primer señalamiento de error, le imputó al tribunal haber errado "al concluir ... que ... no podía negar ... representación legal". Solicitud de revisión, pág. 7. Como hemos visto, hemos resuelto que la póliza expedida por Nationwide cubría el automóvil envuelto en el accidente. Ello es suficiente para disponer de dicho señalamiento.

Aparte de ello, Nationwide no discute en su solicitud de revisión ni en su alegato dicho señalamiento. Es norma claramente establecida, por este Tribunal, que la sola alegación de un error, que luego no se fundamenta o discute, no debe ser motivo para revisar, modificar o de alguna manera cambiar una decisión de un tribunal de instancia. *J.R.T. v. Hato Rey Psychiatric Hosp.*, 119 D.P.R. 62 (1987); *Santos Green v. Cruz*, 100 D.P.R. 9 (1971); *Pueblo v. Matos Pretto*, 93 D.P.R. 113 (1966); *Pueblo v. Febres*, 78 D.P.R. 893 (1956); *De Jesús v. Assad*, 63 D.P.R. 137 (1944); *Sucn. González v. Federal Land Bank*, 51 D.P.R. 469 (1937); *Morales v. Cruz Vélez*, 34 D.P.R. 834 (1926);([26]) *Pueblo v. Cruz*, 34 D.P.R. 211 (1925).

Consecuencia de todo lo anteriormente expresado resulta ser que la codemandada Nationwide vendrá obligada a satisfacer a su asegurada, Sabbagh Thorne, los honorarios de abogado incurridos en su defensa por haber incumplido aquella con su obligación de proveerle representación legal según determinara el tribunal sentenciador.([27]) *PFZ*

---

([26]) Revocado en cuanto a otros extremos.

([27]) Debido a que —como ya indicáramos— el propósito de una póliza de seguros es brindar protección al asegurado, el deber de representarlo legalmente es parte esencial de la cubierta que se contrata con la aseguradora, y la obligación de ofrecer representación legal al asegurado es aún más extensa que la obligación de indemnizar los daños causados por el asegurado a un tercero. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, 136 D.P.R. 881 (1994); *Pagán Caraballo v. Silva, Ortiz*, 122 D.P.R. 105 (1988). Este deber de la aseguradora de proveer representación legal existe, en algunas circunstancias, aun cuando la aseguradora no resulte obligada a pagar los daños causados por el asegurado y aunque la acción sea una infundada, falsa o fraudulenta. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, ante. La obligación de la asegu-

*Props., Inc. v. Gen. Acc. Ins. Co.*, ante; *Pagán Caraballo v. Silva Ortiz*, ante; *Vega v. Pepsi-Cola Bot. Co.*, 118 D.P.R. 661 (1987); *Mun. of San Juan v. Great Ame. Ins. Co.*, 117 D.P.R. 632 (1986).[28]

## VII

En relación a la responsabilidad impuesta por el tribunal sentenciador a la codemandada Sabbagh Thorne, Nationwide afirma que Sabbagh Thorne no es legalmente responsable de los daños producidos por su esposo, Manzano Pozas, mientras éste conducía un vehículo de motor, propiedad de un tercero, en sustitución del vehículo asegurado. Sostiene que ello es así, debido a que el codemandado Manzano Pozas "[n]inguna gestión ganancial hacía" y "[n]ingún beneficio iba a recibir la ya lesionada sociedad de gananciales entre él y su esposa separada". Como veremos, en cuanto a este punto en específico, *le asiste la razón a Nationwide.*

Sabido es que la sociedad legal de gananciales es una entidad completamente distinta a la de los cónyuges que la componen. *Universal Funding Corp. v. Registrador*, 133 D.P.R. 549 (1993); *Ríos Román v. Registrador*, 130 D.P.R. 817 (1992); *Núñez Borges v. Pauneto Rivera*, 130 D.P.R. 749 (1992); *Cruz Viera v. Registrador*, 118 D.P.R. 911 (1987); *Int'l Charter Mortgage Corp. v. Registrador*, 110 D.P.R. 862 (1981); *Rovira Tomás v. Srio. de Hacienda*, 88 D.P.R. 173 (1963); *Rivera v. Casiano*, 68 D.P.R. 190

---

radora de asumir la representación legal surge cuando de una interpretación liberal de las alegaciones surja la posibilidad de que el asegurado esté protegido por la póliza expedida, independientemente de cuál sea la adjudicación final del caso. No obstante, si de las alegaciones surge claramente que los daños reclamados están excluidos de la cubierta de la póliza no podrá imponerse a la aseguradora el deber de defender al asegurado. Cualquier duda sobre si existe el deber de asumir la representación legal en un caso en particular tendrá que ser resuelta a favor del asegurado. *PFZ Props., Inc. v. Gen. Acc. Ins. Co.*, ante.

[28] Véase R.E. Keeton y A.I. Widiss, *Insurance Law*, Minnesota, 1988, pág. 1048.

(1948); *Ex Parte García*, 54 D.P.R. 503 (1939). En relación a las multas y condenas pecuniarias impuesta a uno de los cónyuges antes o durante la existencia del matrimonio, como la de autos, dispone el Art. 1310 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3663, lo siguiente:

> El pago de las deudas contraídas por el marido o la mujer antes del matrimonio no estará a cargo de la sociedad de gananciales.
>
> *Tampoco lo estará el de las multas y condenas pecuniarias que se les impusieren.*
>
> Sin embargo, el pago de las deudas contraídas por el marido o la mujer con anterioridad al matrimonio, y el de las multas y condenas que se le impongan, podrá repetirse contra los gananciales después de cubiertas las atenciones que enumera la sec. 3661, si el cónyuge deudor no tuviese capital propio o fuera insuficiente; pero al tiempo de liquidarse la sociedad se le cargará lo satisfecho por los conceptos expresados. —Código Civil, 1930, art. 1310. (Énfasis suplido.)

Como regla general, el pago de multas y condenas pecuniarias que se le impongan a uno de los cónyuges no será de cargo de la sociedad legal de gananciales. *Cruz Viera v. Registrador*, ante. Ello así, ya que las multas —penalidades económicas impuestas por la comisión de delitos públicos— son de carácter personal y debe pagarlas el cónyuge convicto y multado y no la sociedad de gananciales, salvo en aquellas circunstancias en que ambos cónyuges actuasen de común acuerdo en la perpetración de un crimen. *Lugo Montalvo v. González Mañón*, 104 D.P.R. 372 (1975). Ahora bien, *en casos de responsabilidad civil extracontractual*, la responsabilidad será personal del cónyuge o de la sociedad legal de gananciales *según los hechos que hayan dado lugar a la misma.* Véanse: *Orta v. Padilla Ayala*, 131 D.P.R. 227 (1992); *Asociación de Propietarios v. Santa Bárbara Co.*, 112 D.P.R. 33 (1982); *Lugo Montalvo v. González Mañón*, ante.

La actuación individual de uno de los cónyuges puede acarrear responsabilidad para la sociedad legal de

gananciales cuando de los hechos particulares del caso se desprende que la actividad del cónyuge que produjo el daño *aprovechó económicamente* a la sociedad. *Orta v. Padilla Ayala*, ante; *Cruz Viera v. Registrador*, ante; *Lugo Montalvo v. González Mañón*, ante; *Sepúlveda v. Maldonado Febo*, 108 D.P.R. 530 (1979); *García v. Montero Saldaña*, 107 D.P.R. 319 (1978). Es por ello que en *Lugo Montalvo v. González Mañon*, ante, le impusimos responsabilidad a la sociedad de gananciales del médico demandado y su esposa al concluir que su gestión económica profesional beneficiaba a la masa ganancial, por lo que ésta debía también responder. Luego, en *Albaladejo v. Vilella Suau*, 106 D.P.R. 331 (1977), resolvimos que la sociedad de gananciales del cónyuge demandado era responsable por los daños causados en un accidente de automóvil, cuando el vehículo era conducido por éste en gestiones de su empleo, ya que el empleo de un cónyuge es para beneficio de la sociedad legal de gananciales, por lo que ésta debe responder por los daños causados.

Posteriormente, en *Asociación de Propietarios v. Santa Bárbara Co.*, ante, revocamos una resolución del tribunal de primera instancia en cuanto desestimó la acción de daños y perjuicios contra la sociedad de gananciales de un ingeniero miembro de una sociedad civil cuyos socios se dedicaban al ejercicio de la ingeniería y la arquitectura. En esa ocasión resolvimos que la sociedad legal de gananciales de un socio en una sociedad profesional responde solidariamente por los daños y perjuicios en que incurre dicho socio *mediando negligencia*, ya que en una sociedad civil los verdaderos recipientes de ingresos son los socios que la componen.

Recientemente, en *Orta v. Padilla Ayala*, ante, relevamos de responsabilidad a la sociedad de gananciales de un alcalde por los daños intencionales causados por éste en el

desempeño de sus gestiones oficiales.[29] Allí resolvimos que la sociedad legal de gananciales de un funcionario público no responde solidariamente por los daños y perjuicios que éste cause en el desempeño de sus funciones oficiales, *mediando intención*, por el solo hecho de que ésta recibe los beneficios económicos provenientes de los ingresos del empleo de dicho funcionario.

Como *excepción* a la regla general de que la sociedad de gananciales no responde por los daños causados por uno de sus miembros en actuaciones que no aprovechan a la misma, en caso de que el cónyuge demandado *no* tenga bienes propios con que responder o cuando éstos sean insuficientes, *podrá repetirse* contra los bienes pertenecientes a la sociedad de gananciales. Esto sólo será posible cuando se alegue y se pruebe que la sociedad de gananciales posee bienes suficientes para sufragar en primer término las cargas y obligaciones que dispone el Art. 1308 del Código Civil, 31 L.P.R.A. sec. 3661.[30] *Cruz Viera v. Registrador*, ante; *Flores v. Silva*, 60 D.P.R. 372 (1942). Una vez cubiertas las obligaciones mencionadas en el referido artículo podrá irse contra los bienes de la sociedad de gananciales, de ésta poseer suficientes fondos para responder de la deuda del marido o la mujer sin que se ponga en riesgo

---

[29] Despido discriminatorio y en violación a derechos constitucionales.

[30] El Art. 1308 (31 L.P.R.A. sec. 3661) reza:

"Serán de cargo de la sociedad de gananciales:

"(1) Todas las deudas y obligaciones contraídas durante el matrimonio por cualquiera de los cónyuges.

"(2) Los atrasos o créditos devengados durante el matrimonio, de las obligaciones a que estuviesen afectos así los bienes propios de los cónyuges como los gananciales.

"(3) Las reparaciones menores o de mera conservación hechas durante el matrimonio en los bienes peculiares de cualquiera de los cónyuges. Las reparaciones mayores no serán de cargo de la sociedad.

"(4) Las reparaciones mayores o menores de los bienes gananciales.

"(5) El sostenimiento de la familia y la educación de los hijos comunes y de cualquiera de los cónyuges.

"(6) Los préstamos personales en que incurra cualquiera de los cónyuges."

la solvencia de la sociedad y siempre que se tomen las medidas necesarias para que en su día, al liquidarse la sociedad, se le reconozca el correspondiente crédito al cónyuge inocente. *Cruz Viera v. Registrador*, ante. La responsabilidad de la sociedad legal de gananciales en estos casos es subsidiaria, previa excusión de los bienes privativos del cónyuge legalmente responsable. *Núñez Borges v. Pauneto Rivera*, ante.

En el caso de autos, la gestión realizada por el codemandado Manzano Pozas al momento de la ocurrencia del accidente *no* aprovechaba o beneficiaba económicamente de forma alguna a la masa ganancial de la sociedad de gananciales compuesta por éste y su cónyuge, Sabbagh Thorne. El codemandado Manzano Pozas no conducía el vehículo en gestiones de su empleo; el vehículo conducido por Manzano Pozas no era propiedad de la sociedad de gananciales Manzano-Sabbagh; la codemandada Sabbagh Thorne no estuvo envuelta de forma alguna en el accidente. En consecuencia, forzozo es concluir que la codemandada Sabbagh Thorne, no es legalmente responsable por los daños causados por su esposo, Manzano Pozas, mientras manejaba en estado de embriaguez un vehículo de motor perteneciente a un tercero *en gestiones ajenas a su empleo y que no benefician económicamente a la masa ganancial.* Tampoco lo es la sociedad de gananciales compuesta por ambos codemandados.(³¹)

*Ahora bien, el hecho de que la asegurada nombrada en primer término, Sabbagh Thorne, no sea legalmente res-*

---

(³¹) Véase *Bothe by Gross v. American Family Ins.*, 159 Wis.2d 378, 464 N.W.2d 109 (1990), en que la Corte de Apelaciones de Wisconsin resuelve que la asegurada nombrada, cuyo cónyuge separado causó daños a una tercera persona mientras conducía su automóvil, no es legalmente responsable por los daños causados ya que no estuvo envuelta de forma alguna en el accidente y su esposo no realizaba ninguna gestión en beneficio de la familia. En consecuencia, no siendo ella legalmente responsable y habiéndose estipulado que los codemandados no "vivían en el mismo hogar", no había cubierta bajo la póliza de seguro en controversia.

Nótese, que distinto a la situación en *Bothe by Gross v. American Family Ins.*, ante, en el caso de autos Manzano Pozas "residía en el hogar" de su esposa, asegurada nombrada en primer término, al momento de la ocurrencia del accidente.

*ponsable de los daños causados por su cónyuge, Manzano Pozas, no tiene el alcance de eximir de responsabilidad a la aseguradora codemandada, Nationwide, por el pago de la indemnización decretada. Veamos.*

De acuerdo a las definiciones ofrecidas en la póliza, los términos "usted" y "suyo" "significan o se refieren al asegurado nombrado en primer término en las Declaraciones adheridas, *e incluyen al cónyuge de ese asegurado si vive bajo el mismo techo.*" (Énfasis suplido.) Apéndice, pág. 95. La cubierta de responsabilidad civil por daños a la propiedad ajena y lesiones corporales indica que bajo la misma, "si *usted* [el asegurado nombrado en primer término o el cónyuge de éste si vive bajo su mismo techo, o sea, Sabbagh Thorne o su esposo Manzano Pozas] viene obligado legalmente a pagar daños que resulten de la posesión, mantenimiento, uso, carga o descarga del automóvil suyo, *nosotros* [—Nationwide Mutual Insurance Company—] pagaremos por tales daños". (Énfasis suplido.) Apéndice, pág. 96. Se indica en la misma, además, que "[c]ualquier persona que viva en el hogar suyo está protegida". (Énfasis suplido.) Apéndice, pág. 96.

Las cubiertas de Daños a la Propiedad Ajena y Lesiones Corporales de la póliza de seguro de automóvil expedida por Nationwide aplican, en adición del vehículo asegurado, a un vehículo de motor que no sea propiedad del asegurado nombrado mientras sustituya temporalmente su automóvil, por éste encontrarse fuera de uso debido a desperfectos mecánicos, reparación, recibiendo servicio de mantenimiento, pérdida o destrucción. Además, la protección se extiende a un vehículo de motor perteneciente a cualquier persona que no sea un miembro del hogar del asegurado nombrado. Esta protección "aplica únicamente mientras dicho automóvil está siendo usado *por usted o por cualquier pariente viviendo en su hogar*" —(énfasis suplido) Apéndice, pág. 97— es decir, por el asegurado nombrado en primer término (Sabbagh Thorne), su cónyuge (Manzano

Pozas) si vive bajo el mismo techo e inclusive cualquier otro pariente viviendo en el hogar del asegurado nombrado en primer término (Sabbagh Thorne). *Lo anterior nos lleva a concluir que el codemandado Manzano Pozas es un asegurado adicional dentro de los términos de la póliza, y como tal, acreedor de la protección ofrecida en la misma, independientemente de la responsabilidad legal, o no, de su esposa como asegurada en primer término.*

En consecuencia, *no obstante* haber errado el foro de instancia al resolver que la codemandada Sabbagh Thorne era solidariamente responsable de los daños causados por su cónyuge en dicho accidente, *actuó correctamente el mencionado tribunal sentenciador al concluir que la póliza de seguro expedida por Nationwide, a favor de la codemandada Sabbagh Thorne, cubría el vehículo envuelto en el accidente.*

## VIII

Por otra parte, Nationwide señala que erró el tribunal sentenciador al condenarle a pagar daños en exceso de los límites de su cubierta.

De acuerdo a lo consignado en las declaraciones adheridas a la póliza expedida por Nationwide a favor de la codemandada Sabbagh Thorne, el límite de la cubierta de responsabilidad civil por lesiones corporales era de cien mil dólares ($100,000) por persona, hasta un total de trescientos mil dólares ($300,000) por ocurrencia. Dicha cubierta no se extendía a daños por angustias y sufrimientos mentales. Nationwide sostiene que, de ser responsable, su responsabilidad sería hasta la cantidad especificada en las declaraciones adheridas a la póliza; esto es, hasta cien mil dólares ($100,000) en el presente caso.

La póliza en controversia establece, en lo pertinente, en relación a los límites de pago bajo la cubierta de responsabilidad civil, lo siguiente:

*CANTIDADES PAGADERAS POR PERDIDAS DE RESPON-SABILIDAD CIVIL* Nuestra obligación de pagar por daños a la propiedad o lesiones corporales está limitada a las cantidades especificadas por persona y por ocurrencia en las Declaraciones adheridas a la póliza. Las siguientes condiciones aplican a estos límites:

1. Para responsabilidad civil por daños a la propiedad, el límite especificado es el límite para todos los daños legales en una ocurrencia.

2. Para responsabilidad civil por lesiones corporales, el límite especificado por persona es el límite para todos los daños legales reclamados por cualquiera por lesiones corporales o pérdida de servicios de una persona como resultado de una ocurrencia. El límite total de nuestra responsabilidad especificado por ocurrencia es el límite para todos los daños sufridos por dos o más personas.

. . . . . . . . .

4. En cualquier pérdida cubierta bajo "USO DE OTROS VEHICULOS DE MOTOR" el límite de responsabilidad será el límite más alto aplicable a cualquier vehículo especificado en esta póliza.

. . . . . . . .
*OTRO SEGURO* .... (Énfasis en el original.) Apéndice, págs. 97–98.

La compañía aseguradora que expida una póliza asegurando a una persona contra daños o perjuicios, por causa de responsabilidad legal por lesiones corporales, muerte o daños a la propiedad de una tercera persona, será absolutamente responsable cuando ocurriere una pérdida cubierta por dicha póliza, y el pago de dicha pérdida por el asegurador hasta el grado de su responsabilidad por la misma, se hará con arreglo a la póliza y sin que dependa del pago que efectúe el asegurador en virtud de sentencia firme dictada contra él con motivo del suceso, ni de dicha sentencia. Código de Seguros, Art. 20.010 (26 L.P.R.A. sec. 2001).

▆▆ De ordinario, el asegurador sólo responde hasta los límites de responsabilidad estipulados en la póliza de seguro por las pérdidas cubiertas por dicha póliza.[32] A

---

[32] *Couch*, supra, Sec. 56:1.

modo de excepción, en casos en que sea evidente que la aseguradora actuó de mala fe anteponiendo sus propios intereses a los del asegurado, es razonable imponer a la aseguradora la responsabilidad de pagar cualquier suma en exceso del límite de estipulado en la póliza. Ello así, por razón del convenio implícito que nace de los contratos de seguro y que exige al asegurador la obligación de actuar con especial consideración por los intereses del asegurado. *Morales v. Automatic Vending Service, Inc.*, 103 D.P.R. 281 (1975).[33]

De conformidad, en *Morales v. Automatic Vending Service, Inc.*, ante, le impusimos responsabilidad a la aseguradora en exceso de los límites de la cubierta al concluir, como lo hizo el tribunal de instancia, que la misma había actuado de mala fe, caprichosa y negligentemente al no aceptar una oferta de transacción, dentro de los límites de la póliza, hecha por los demandantes en un caso de clara responsabilidad por parte del asegurado. De esta manera, la aseguradora en dicho caso antepuso sus propios intereses a los del asegurado en violación de su relación fiduciaria que le obligaba a actuar de la mejor buena fe y con suma discreción y diligencia al considerar cualquier oferta de transacción que fuese razonable.

En el caso que nos ocupa, el tribunal sentenciador *no* hizo determinación alguna sobre la actuación de la aseguradora en relación a este extremo, limitándose sólo a indicar que la misma no podía negar cubierta así como tampoco representación legal. *No* tenemos elementos de juicio suficientes para concluir que la aseguradora en el presente caso actuó de mala fe y caprichosamente al negar cubierta y representación legal a los codemandados Sabbagh Thorne y Manzano Pozas. El hecho de negar cubierta y/o representación legal no es, de por sí, una actua-

---

[33] Véase: Keeton y Widiss, *op. cit.*, págs. 1051 y 1054–1058; *Sparks v. Republic Nat. Life*, 647 P.2d 1127 (1982); *Gulf Atlantic Ins. Co. v. Barnes*, 405 So. 2d 916 (1981); *Continental Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281 (1980).

ción mal intencionada por parte de la aseguradora; es a la luz de la totalidad de las circunstancias que rodearon tal negativa que pueden surgir indicios de mala fe por parte de ésta.[34]

En consecuencia, erró el tribunal sentenciador al condenar a la aseguradora codemandada Nationwide a pagar en daños, por concepto de lesiones corporales, cantidades en exceso de los límites de responsabilidad estipulados en su póliza, en ausencia de una determinación de mala fe que justifique la imposición de tal responsabilidad. De igual forma, erró al condenar a Nationwide al pago de daños por concepto de sufrimientos y angustias mentales, habida cuenta del hecho de que la codemandada Sabbagh Thorne y su esposo, Manzano Pozas, no son acreedores de tal protección bajo los términos y condiciones de su póliza de seguro.

## IX

Por último, la codemandada recurrente Nationwide señala que erró el tribunal sentenciador al no aplicar la doctrina de negligencia comparada y al, alegadamente, estimar los daños excesivamente. Basa su señalamiento en nuestra decisión en *Molina Caro v. Dávila*, 121 D.P.R. 362 (1988).[35] Sostiene que el codemandante Quiñones López fue negligente al tratar de cruzar en un sitio donde no existe cruce de peatones oficial y sin tomar las debidas precauciones, y que en comparación con la indemnización concedida al demandante en *Molina Caro v. Dávila*, ante, por las lesiones corporales sufridas, la indemnización conce-

---

[34] W.M. Shernoff *et al.*, *Insurance Bad Faith Litigation*, Nueva York, Ed. Mathew Bender, Cap. 3, Sec. 3.12(1)(b); *Previews, Inc. v. California Union Ins. Co.*, 640 F.2d 1026 (9no Cir. 1971). *Executive Aviation, Inc. v. National Ins. Underwriters*, 94 Cal.Rptr. 347 (1971).

[35] Revocado en *Miranda v. E.L.A.*, 137 D.P.R. 700 (1994), en cuanto al aspecto de reducción de la indemnización en casos de negligencia concurrente por parte del demandante.

dida por el tribunal de instancia en el caso de autos resulta ser excesiva.

Como es sabido, el que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. Sabido es también que la imprudencia concurrente del perjudicado no exime de responsabilidad pero conlleva la reducción de la indemnización. Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141. Esto último se conoce como la doctrina de la negligencia comparada, la cual fue adoptada en nuestra jurisdicción por disposición de la Ley Núm. 28 de 9 de junio de 1956, que adicionó la última oración del Art. 1802 de nuestro Código Civil, ante. H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1986.

En relación a esta doctrina, Brau del Toro, *op. cit.*, señala lo siguiente:

> Conforme a esta doctrina, la que impera al presente en Puerto Rico, la negligencia concurrente o contribuyente del demandante (y la asunción de riesgos por éste), sirve para mitigar, atenuar o reducir la responsabilidad pecuniaria del demandado, pero no para eximir totalmente de responsabilidad a éste.
>
> Se ha dicho que esta norma tiende a individualizar las indemnizaciones por daños, colocando el rigor económico en las partes conforme a la proporción de su descuido o negligencia. Requiere que en todos los casos el juzgador, además de determinar el monto de la compensación que corresponde a la víctima, determine la fracción (o la percentila) de responsabilidad o negligencia que corresponde a cada parte, y reduzca la indemnización del demandante de conformidad con esta ditribución de responsabilidad.
>
> Así pues, para determinar la negligencia que corresponde a cada parte en casos de negligencia comparada es necesario analizar y considerar todos los hechos y circunstancias que mediaron en el caso, y particularmente si ha habido una causa predominante.

El tribunal sentenciador en sus determinaciones de hechos consignó lo ocurrido como sigue:

5. Al salir de la actividad el co-demandante [Quiñones López] en unión a otros amigos decidieron ir al Restaurant El Zipperle a comer algo.

6. Como el co-demandante Quiñones López no tenía automóvil el Sr. Luis Alberto Rivera Siaca se ofreció a llevarlo.

7. El Sr. Rivera Siaca tenía su vehículo en el lado sur de la Avenida Roosevelt la cual cuenta con tres carriles de este a oeste y tres en dirección contraria dividida por una isleta central.

8. El co-demandante Quiñones López y su amigo cruzaron los carriles que discurrían hac[i]a el este y llegan a la isleta central.

9. Ese día había lloviznado por lo que el pavimento estaba húmedo.

10. Al llegar a la isleta el Sr. Rivera Siaca comenzó a cruzar cuando se percató que por el carril que iba venía un vehículo dando zig zag y a velocidad por lo que aceleró el paso para no ser atrapado.

11. El co-demandante, Quiñones López, se había quedado rezagado en la isleta porque otro de los amigos lo había llamado desde la acera y se volteó para atenderlo.

12. En ese momento el vehículo que se acercaba de este a oeste, un Toyota Célica conducido por el co-demandado Pedro Manzano Pozas aplicó los frenos al percatarse de que estaba cruzando un peatón, se subió a la isleta 'e impactó al co-demandante lanzándolo hacía arriba y tirándolo en la isleta. El vehículo conducido por el co-demandado, Manzano Pozas tenía impacto en el tapalodo del lado izquierdo con abolladura hac[i]a adentro y la goma delantera del lado izquierdo estaba vacía.

13. El co-demandado, Manzano Pozas, expidió olor a licor, no se mantenía firme y no cordinaba los pasos al caminar por lo que fue sometido a la prueba de aliento la cual arrojó 0.17% de alcohol en el organismo.

14. El accidente se debió única y exclusivamente a la negligencia del co-demandado, Pedro Manzano Pozas al conducir a velocidad sin tomar en consideración la condición del pavimento, la presencia de peatones cruzando y en estado de embriaguez. Apéndice, págs. 28–29.

Como podemos notar, en el presente caso el codemandante Quiñones López *no* intentó cruzar la calle, sino que se mantuvo en la isleta central que divide la referida avenida mientras atendía a una persona que le hablaba desde el otro extremo, cuando fue impactado por el automóvil conducido por el codemandado Manzano Pozas. *No es de*

*esperarse que en el curso normal de los acontecimientos un
automóvil abandone la vía de rodaje y se suba a la isleta
que divide la misma.* Cualesquiera que fueran las razones
que tuvo el codemandado Manzano Pozas para abandonar
la vía de rodaje y subirse a la isleta, las mismas no respon-
den a la actuación del codemandante Quiñones López.(36)
Examinados los hechos y la correcta sucesión de los even-
tos, según determinados por el tribunal de instancia, con-
cluimos que actuó correctamente el tribunal sentenciador
al no aplicar la doctrina de negligencia comparada.

 Finalmente, en relación a la estimación de los da-
ños, sufridos por el codemandado Quiñones López, hecha
por el tribunal de instancia, reiteradamente hemos seña-
lado que la valoración de los daños descansa en la sana
discreción del juzgador. *Torres Solís et al. v. A.E.E. et als.*,
136 D.P.R. 302 (1994); *Ruiz Guardiola v. Sears Roebuck*,
100 D.P.R. 817 (1972). Ciertamente, nos merece gran defe-
rencia la discreción que ejercitan los tribunales de instan-
cia en su apreciación de daños. *Colón v. Municipio de Gua-
yama*, 114 D.P.R. 193 (1983); *Maldonado v. Interamerican
University*, 104 D.P.R. 420 (1975). Ello, por razón de que
los tribunales de primera instancia, de ordinario, están en
mejor posición de determinar los daños sufridos por tener
contacto directo con la prueba del reclamante. Es por ello
que las partidas concedidas como indemnización por el tri-
bunal de instancia no serán alteradas en revisión salvo que
resulten ser claramente inadecuadas e improcedentes, esto
es "ridículamente bajas o exageradamente altas". *Torres
Solís et al. v. A.E.E. et als.*, ante; *Sanabria v. E.L.A.*, 132
D.P.R. 769 (1993); *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294
(1990); *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985);

---

(36) De poder imputársele algún grado de negligencia al codemandante Quiño-
nes López, cualquiera que fuera, sería tan ínfima que la mayor la absorbería total-
mente, excluyendo así la aplicación de la norma de negligencia comparada. *Cárdenas
Maxán v. Rodríguez Rodríguez*, 125 D.P.R. 702 (1990); *Toro Lugo v. Ortiz Martínez*,
113 D.P.R. 56 (1982).

*Publio Díaz v. E.L.A.*, 106 D.P.R. 854 (1978); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975); *Valldejuli Rodríguez v. A.A.A.*, 99 D.P.R. 917 (1971); *Prado v. Quiñones*, 78 D.P.R. 322 (1955). Debe mantenerse presente, por otro lado, que la parte que ante este Foro solicita la modificación de las sumas concedidas a nivel de instancia viene obligada a demostrar la existencia de las circunstancias que hacen meritorio el que se modifiquen las mismas. *Rodríguez Cancel v. A.E.E.*, ante.

La parte demandada recurrente, como ya indicáramos, sostiene que las cuantías concedidas en el presente caso, resultan ser excesivas al compararlas con las concedidas en *Molina, Caro v. Dávila*, ante. Según expresáramos en *Rodríguez Cancel v. A.E.E.*, ante, pág. 452, "[c]omo sabemos, *no hay dos casos exactamente iguales; cada caso se distingue por sus propias y variadas circunstancias.* Es por ello que —a pesar de que es aconsejable que los tribunales de instancia utilicen como guía o punto de partida las cuantías concedidas por este Tribunal en casos 'similares' anteriores— la decisión que se emita en un caso en específico en relación con esta materia *no puede ser considerada como precedente obligatorio para otro caso"*.[37] (Énfasis suplido.)

En relación a los daños sufridos por el codemandante Quiñones López, el tribunal de instancia determinó que éste, de cincuenta (50) años de edad e ingeniero de profesión, perdió el conocimiento al ocurrir el impacto; sufrió una fractura conminuta desplazada subtrocantérica del fémur debajo del trocante menor del lado izquierdo de la pierna; fue intervenido quirúrjicamente en el subtrocanter y se le puso una placa de metal la cual le fue fijada con nueve (9) tornillos; fue intervenido quirúrjicamente, por segunda ocasión, removiéndole los tornillos que sujetaban la placa de metal e insertándole un "Zickel Nail" de trece

---

[37] Véanse: *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Vda. de Silva v. Auxilio Mutuo*, 100 D.P.R. 30 (1971); *Baralt v. Báez*, 78 D.P.R. 123 (1955).

milímetros (13 mm.) por la punta del trocanter; le fue practicado un injerto de hueso en el área del subtrocanter; tardó seis meses en sanar de la segunda intervención, teniendo que utilizar muletas para movilizarse, sufriendo posteriormente una atrofia de los músculos quedando algo de debilidad en la extremidad sin que pueda recuperar su fuerza original; se afectó tanto en su vida familiar como profesional. El tribunal sentenciador estimó los daños del codemandante Quiñones López en la suma de ciento cincuenta y un mil dólares ($151,000).[38] Además, estimó los sufrimientos y angustias mentales de la codemandante Rivera Mathews, esposa de Quiñones López, en veinticinco mil dólares ($25,000) y los de los codemandantes hijos de éste en cinco mil dólares ($5,000) cada uno. *Examinados los autos, y las determinaciones de hecho que a esos efectos realizara el tribunal de instancia, concluimos que las mismas están sostenidas por la prueba presentada.*

De otra parte, los demandantes recurridos nos piden, como parte de la súplica de su oposición a la solicitud de revisión y su alegato, que corrijamos un alegado error en la sentencia dictada por el tribunal de instancia en el presente caso. Señalan que la Regla 44.3 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone para el pago de intereses al tipo en vigor fijado por la Junta Financiera de la Oficina del Comisionado de Instituciones Financieras desde la fecha de la sentencia o desde la fecha de radicación de la demanda, en casos de daños y perjuicios, cuando medie temeridad. A tal efectos nos solicitan que modifiquemos la referida sentencia de conformidad con las determinaciones de hechos de la misma a los fines de ordenar el pago de intereses a partir de la fecha de la radicación de la demanda y hasta el total y completo pago de la sentencia.

En realidad, lo que nos pide la parte demandante

---

[38] Aun cuando en la demanda se reclamó pérdida de ingresos y gastos médicos, el tribunal de instancia no concedió éstos por entender que los mismos no fueron establecidos por la prueba presentada.

recurrida, mediante un escueto señalamiento, es que hagamos una determinación a nivel apelativo de que los demandados recurrentes procedieron con temeridad al defenderse en el presente pleito. No podemos acceder a lo solicitado. La determinación de si una parte ha procedido con temeridad descansa en la sana discreción del tribunal de instancia. *Elba A.B.M. v. U.P.R.*, ante.

Ahora bien, independientemente de que un demandado no haya sido temerario, éste viene obligado a pagar los intereses legales correspondientes que se acumulan sobre la cuantía adjudicada por sentencia. Los intereses legales sobre la sentencia forman parte integrante de la sentencia dictada y pueden ser recobrados aun cuando no se mencionen en la misma. *Riley v. Rodríguez Pacheco*, 124 D.P.R. 733 (1989); *Municipio de Mayagüez v. Rivera*, 113 D.P.R. 467 (1982). En el caso de autos, los intereses deberán satisfacerse sobre la cuantía desde la fecha en que el tribunal de instancia dictó sentencia final, utilizando como base para su cómputo el tipo de interés legal vigente a dicha fecha, hasta el día en que ésta sea satisfecha. *Riley v. Rodríguez Pacheco*, ante; Regla 44.3 de Procedimiento Civil, ante.

Por los fundamentos antes expresados, *se modifica la sentencia dictada en el presente caso por el Tribunal de Primera Instancia, Sala Superior de San Juan, de acuerdo con lo arriba expresado, y así modificada se confirma la misma.*

El Juez Asociado Señor Negrón García concurrió con el resultado sin una opinión escrita. El Juez Presidente Señor Andréu García se inhibió.